Larry WEYANT and Charles Weyant, Plaintiffs–Appellants,

v.

George S. OKST, Irvin Richard Weber, Joseph Peter Auberger, Jr., Lawrence Mueller, Defendants,

George S. Okst and Joseph Peter Auberger, Jr., Defendants– Appellees.

No. 1736, Docket 95–7090.

United States Court of Appeals, Second Circuit.

Argued June 18, 1996.

Decided Dec. 3, 1996.

Stephen Bergstein, Goshen, NY (Michael H. Sussman, Goshen, New York, on the brief), for Plaintiffs–Appellants.

Vincent Leong, Assistant Attorney General, New York City (Dennis C. Vacco, Attor-

ney General of the State of New York, Thomas D. Hughes, Assistant Solicitor General, Darell Joseph, Assistant Attorney General, New York City, on the brief), for Defendants–Appellees.

Before: KEARSE, MAHONEY,* and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiffs Larry Weyant ("Larry") and Charles Weyant ("Charles") appeal from so much of a final judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, *Judge,* as dismissed their claims brought under 42 U.S.C. § 1983 (1994) against two New York State Police officers, defendants George S. Okst and Joseph Peter Auberger, Jr. Larry sought damages from Okst for false arrest and the use of excessive force; Charles sought damages from both Okst and Auberger for their refusal to allow him to obtain needed medical treatment after his arrest. The district court granted partial summary judgment (a) dismissing Larry's false-arrest claim on the ground that it was barred by a verdict of guilty returned against him in the state-court criminal prosecution that followed his arrest, and (b) dismissing Charles's claim for denial of medical care on the ground that Okst and Auberger offered plausible reasons for the denial. Larry's excessive-force claim was dismissed following a trial that ended in a jury verdict in favor of Okst. On appeal, Larry contends principally that summary judgment was improper with respect to his false-arrest claim because (a) the guilty verdict in the criminal prosecution was overturned, and the case ultimately terminated in his favor, and (b) there were genuine issues to be tried as to whether his arrest was supported by probable cause. Charles contends principally that there were genuine issues of material fact to be tried with respect to his medical-treatment claim, and hence summary judgment was inappropriate. For the reasons that follow, we agree that summary judgment was improperly granted, and we vacate so much of the judgment as

dismissed the false-arrest and medical-treatment claims; we remand for trial of those claims.

## I. BACKGROUND

This litigation arises out of events in connection with the November 11, 1991 arrests of the Weyants and the ensuing prosecution of Larry. The record as to those arrests and the treatment of Charles, Larry's 70–year–old father, viewed in the light most favorable to the Weyants as the parties against whom summary judgment was granted, showed the following.

### A. The Arrests and the Denial of Medical Attention to Charles

Larry was the co-owner of approximately 154 acres of vacant, wooded land located in the Town of Deer Park, New York (the "Property"), which he and his friends used as a hunting camp. The main entrance to the Property was a 20–foot–wide gate; on nearby trees were posted signs stating "Private Property, Keep Out" and bearing Larry's address.

On November 11, the Weyants, with friends including John A. Cambareri, went to a hunting camp on the Property. At about five o'clock, Charles, a severe diabetic, left the campsite with Cambareri and drove down the gravel road leading to the main gate because he needed insulin.

As Charles neared the gate, several law enforcement officers, of about 20 in the immediate area, ran into the path of his car. The officers had convened to investigate a report of a "possibility of an escape attempt" from a nearby correctional facility. (Deposition of George S. Okst at 21.) One officer put a machine gun to Charles's head and threatened to "blow [his] fucking brains out." (Deposition of Charles Weyant ("Charles Dep.") at 58.) When Charles sought to ask questions, Okst and Auberger ordered him to "shut up." (*Id.* at 64.) Charles and Cambareri told Okst and other officers that Charles's son Larry would soon be driving down the

* The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996, and the appeal is being decided by the remaining two members of the panel, who are in agreement. *See* Local Rule § 0.14(b).

mountain, that the land they were on was owned privately, and that Larry was the owner. (Deposition of John A. Cambareri ("Cambareri Dep.") at 100.) Okst responded that he "didn't care." (*Id.*) Charles was handcuffed and placed in the back seat of Auberger's car.

At some point before Larry arrived on the scene, Okst and Auberger

> ascertained by radio there had been no escape from the federal correctional institution and Mr. Weyant and Camb[a]reri were placed under arrest for violating the New York State Environmental Conservation law which prohibits possessing jacklights for deer while a person is armed and is present on land inhabited by deer.

> So, thereafter, Larry Weyant arrived and it's disputed what happened thereafter, but in any event, he was arrested, too, apparently by Trooper Okst.

(Hearing Transcript, December 16, 1994 ("Tr."), 15–16 (description by the district court); *see also* Cambareri Dep. at 98–99.)

When Larry drove down the mountain toward the main gate, as Charles and Cambareri had informed the officers he would, a number of officers ran toward his car with their guns drawn, forcing him to stop. One put an automatic weapon to Larry's head and said, "if you move I'll blow your fucking brains out." (Deposition of Larry Weyant ("Larry Dep.") at 38.) The officers pulled Larry from his car, handcuffed him, and put him in a second trooper's car. Larry testified that during his arrest, he spoke only to ask what was happening, to identify himself by name and address, and to state that he was the Property's owner. He testified that though the officers were shouting obscenities at him, he did not raise his voice or use profanity. (*See, e.g.,* Larry Dep. at 170 ("These men had guns pointed at my head, told me they were going to kill me. Who in their right mind is going to start swearing and raising hell.").) Cambareri similarly testified that Larry used no profanity, merely asked what was going on, and stated that he owned the Property; the officers told Larry to "shut the fuck up." (Cambareri Dep. at 110–11.) Larry was eventually charged, in informations filed by Okst, with one count of disorderly conduct and one count of resisting arrest.

In the meantime, Charles was held in Auberger's car for some 30 minutes while the officers waited for and then dealt with Larry. Still not having taken his required dosage of insulin, Charles was slumped over in the back seat, soaked with perspiration. He testified that his tongue had swelled and he could hardly talk, that his ears were ringing, and that he kept losing consciousness. His appearance was such that, when Auberger returned to the car after assisting other officers, Auberger asked Charles what was wrong. Charles responded that "he was feeling dizzy, that he was a diabetic and he was overdue on his insulin." (Affidavit of Joseph P. Auberger, dated November 30, 1994, ¶ 7.) Charles told Auberger that he was in insulin shock. Auberger said he would take Charles to a nearby hospital. Auberger started to drive Charles to the hospital but was stopped by Okst. Okst, notwithstanding having been told by Larry that Charles was a diabetic and having been told by Auberger that Charles was ill, instructed Auberger to take Charles to the police barracks, not to a hospital.

The Weyants and Cambareri were taken to the barracks. During the drive, Charles continued to perspire profusely, was hardly able to speak, and repeatedly lost consciousness. After they arrived, Charles again stated that he was a severe diabetic and that he needed to go to the hospital. (Cambareri Dep. at 108.) Okst responded, "We're not a goddamn taxicab." (*Id.* at 108–09.) Larry too made additional efforts at the barracks to get his father prompt medical care. Okst repeatedly told them "all to shut up." (*Id.* at 109.) Charles was held at the barracks until about 9 p.m. In the interim, no doctor saw him; Okst, who had had paramedic training, made no effort to examine him. Charles was put on a bench where he continued to perspire, suffer difficulty speaking, and sit as if in a trance.

Finally, one of the troopers telephoned Charles's wife Helen, who arrived at approximately 8 p.m. to find her husband slumped over and trembling uncontrollably. Helen told Okst that Charles needed medical atten-

tion immediately; Okst apparently did not respond. Helen had brought insulin and food; since she had no experience in giving injections, Charles had to administer the insulin to himself. However, because he was shaking so badly, Helen began to spoon-feed him the yogurt she had brought. As she was feeding him, Charles told her that Okst had kicked and beaten Larry. Helen then

> turned to Okst and said "You did what?". Okst got very red in the face and left the room for a few minutes, and when he returned he told me that I had to leave. I told him that I would leave when I was through with Charles, to which he replied, "This is my house and you'll leave when I tell you to leave, we're not having a fucking picnic in here". Okst was getting worked up and he got closer to me, I felt as if he was going to hit me.

(Affidavit of Helen K. Weyant, dated December 9, 1994, ¶ 9.) According to both Charles and Helen, Auberger jumped in front of Okst and stopped him from grabbing or hitting Helen. (*Id.*; Charles Dep. at 104.) Okst's intimidation caused Helen to depart before she could finish feeding Charles.

Other than Auberger's bringing him water, this was the only care Charles received for his physical condition while he was in police custody. Though he started to "perk up" a bit after Helen arrived and he had his shot (Larry Dep. at 99), Charles remained in shock (*id.* at 98–99), and the incident had lingering adverse effects on his health (Charles Dep. at 24–25).

## B. *The State Court Criminal Proceedings*

In August 1992, Larry was tried in the Town of Deer Park Local Justice Court ("Town Court") on the disorderly-conduct and resisting-arrest charges filed by Okst. The jury found him not guilty of disorderly conduct. It found him guilty of resisting arrest; but on appeal, the New York State Supreme Court Appellate Term set aside the conviction on the ground that the information was "insufficient on its face," *People v. Weyant*, No. 93–787 (N.Y.App. Term Nov. 15, 1993); the New York Court of Appeals denied the prosecution's application for leave to appeal the Appellate Term ruling, *see* 83

N.Y.2d 811, 611 N.Y.S.2d 147, 633 N.E.2d 502 (1994). The Appellate Term decision stated:

> Judgment of conviction unanimously reversed on the law, fine and surcharge, if paid remitted, and information dismissed.

> The information charging defendant with resisting arrest fails to set forth nonhearsay allegations establishing, if true, that defendant's arrest was authorized, and was therefore insufficient on its face (*People* v. *Alejandro*, 70 N.Y.2d 133, 517 N.Y.S.2d 927, 511 N.E.2d 71).

No new prosecution was commenced.

## C. *The Proceedings in the Present Case*

In January 1994, the Weyants commenced the present action against Okst, Auberger, and others, asserting claims under 42 U.S.C. § 1983 and state law. To the extent pertinent to this appeal, the complaint alleged that Okst's arrest of Larry for disorderly conduct and resisting arrest occurred without probable cause; that Okst violated Larry's due process rights by using excessive force against him during the arrest, to wit, punching him in the groin and knocking him down a hill into a rock pile; and that Okst and Auberger violated Charles's rights by denying him proper attention for his serious medical needs.

Following discovery, defendants moved to dismiss some or all of the claims against them. Auberger moved for summary judgment dismissing all of the claims against him; Okst moved for partial summary judgment dismissing all except the claim for excessive force. In a decision from the bench, the district court granted the motions. To the extent pertinent here, the court ruled that Larry's claim for false arrest was precluded by the guilty verdict returned by the Town Court jury on the charge of resisting arrest, notwithstanding the fact that that verdict had thereafter been voided because the Town Court lacked jurisdiction. The district court stated that Larry

> was found guilty of resisting arrest and not guilty of disorderly conduct.... He appealed the conviction to the Appellate Term which reversed on grounds not having to do with the merits but simply be-

cause the information failed to charge or to set forth non-hearsay allegations establishing, if true, that the defendant's arrest was authorized. And thereafter, of course, this lawsuit eventuated.

The Court concludes, as a matter of law, that in order to establish a claim for false imprisonment or false arrest, there must be a showing of no probable cause.... [A] person who think[ ]s there's not probable cause must pursue the case to an acquittal or unqualified dismissal or otherwise waive his Section 1983 claim....

     ....

As to Larry Weyant, ... a claim for false arrest is barred unless the prosecution terminated in some manner, indicating that the person was not guilty of the offense charged....

The original verdict of guilty ... supports a finding of probable cause, and as we discussed reversing by the Appellate Term is based solely on two jurisdictional effects [*sic*] which leaves open the question of guilt or innocence and the finding of probable cause is warranted on the uncontested facts here.

So the claim of false arrest must be dismissed.

(Tr. 18–20.)

MR. THORNTON [Attorney for plaintiffs]: Just to clarify the issue of Larry Weyant, the conviction was overturned on a jurisdictional motion. Obviously there was an [*sic*] opportunity then for him to reverse the judgment on the merits. So we would contend under that scenario—

THE COURT: .... It's often the case that a criminal conviction is disposed of without regard to the issue of innocence. In fact, it's more common than uncommon. On the totality of the facts here, it is more likely than unlikely there was probable cause.

(*Id.* 23.)

As to Charles's claim for denial of medical care, the court found that Auberger was not liable because he was merely following Okst's instructions:

Plaintiffs allege that Mr. Auberger noticed that Charles Weyant was in a deteri-

orating physical condition and exhibiting signs of insulin shock and Charles said so and Auberger said he would take him to the hospital. However, Okst then intervened in the issue and told Auberger to take the patient to the barracks at Middletown first and Okst stated to Auberger that based on his own experience as a paramedic, that he did not perceive that Charles was in insulin shock and he was flush and red faced and coherent and Okst told Auberger to take him to Middletown, where if he requested to go to the hospital, he would then be sent.

The Court finds that it was permissible for Auberger to accede to that direction based on his knowledge and the experience of Okst in paramedical training and that there was no intentional violation on the part of Auberger when he followed the directions of Okst and took Charles Weyant to the barracks....

(*Id.* 17.) The court found that Okst was not liable because there was not "unnecessary and wanton infliction of pain" and the reasons Okst gave for not allowing Charles to be taken to the hospital "sound[ed] rational":

Now, as far as the medical care is concerned, the plaintiff must show that the deprivation was sufficiently serious and it was unnecessary and wanton infliction of pain. This Court cannot see that a reasonable juror here could find a decision to take him to the barracks first and then to the hospital was part of an unnecessary and wanton infliction of pain or distress and the person making the decision was an experienced paramedic.

The reasons [Okst] gave sound rational and this Court is not in a position to second guess the judgment as to denial of medical treatment. Auberger had a right to accede to the directions of Okst, recognizing that Okst had had medical training....

So the claim for denial of medical treatment should be and hereby is dismissed.

(*Id.* 22.)

The remaining § 1983 claim, *i.e.*, Larry's claim against Okst for excessive force, was tried to a jury, which returned a verdict in

favor of Okst. A final judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Larry and Charles contend principally that the district court erred in granting summary judgment dismissing their respective claims for false arrest and denial of medical care because the court applied erroneous principles of law and resolved disputed issues of fact. Auberger and Okst contend that the summary dismissals of those claims should be affirmed either on the grounds adopted by the district court or on the ground that they were entitled to qualified immunity. For the reasons that follow, we conclude that, as to both claims, summary judgment was inappropriate on either ground.

### A. *Larry's Claim for False Arrest*

Under New York law, a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification. *See, e.g., Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 313–14, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, *see, e.g., Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995), is substantially the same as a claim for false arrest under New York law, *see, e.g., Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). The existence of probable cause to arrest constitutes justification and "is a complete defense to an action for false arrest," *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994), whether that action is brought under state law or under § 1983. *See, e.g., Broughton v. State,* 37 N.Y.2d at 458, 373 N.Y.S.2d at 95, 335 N.E.2d at 315 (under New York law, "[j]ustification may be established by showing that the arrest was based on probable cause"); *Singer v. Fulton County Sheriff,* 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, *see, e.g., Singer v. Fulton County Sheriff,* 63 F.3d at 118–19 (affirming summary dismissal of claim on the ground that the facts as to store owner's complaint of theft revealed existence of probable cause), or may require a trial if the facts are in dispute, *see, e.g., Moore v. Comesanas,* 32 F.3d 670, 673 (2d Cir.1994) (where question of whether arresting officer had probable cause was "predominantly factual in nature, [it] was properly presented to the jury").

If, following the arrest, the plaintiff was convicted of the charges against him, that conviction normally "would be conclusive evidence of probable cause." *Broughton v. State,* 37 N.Y.2d at 458, 373 N.Y.S.2d at 95, 335 N.E.2d at 315. But this is so only if the conviction "survives appeal." *Id.* A conviction that has been reversed on appeal is no evidence of the existence of probable cause; to the contrary, "evidence of a subsequent dismissal, acquittal or reversal on appeal would ... be admissible to refute ... justification." *Id.*

### 1. *Reliance on the Town Court Verdict of Guilty*

The district court ruled that the jury verdict in the Town Court prosecution of Larry

constituted conclusive evidence of probable cause to arrest him for resisting arrest, on the premise that a claim under § 1983 for false arrest is barred unless the prosecution ended in a manner indicating that the accused was not guilty of the offense charged. Relying principally on *Roesch v. Otarola*, 980 F.2d 850 (2d Cir.1992), the court stated that a person who thinks probable cause was lacking must pursue the case to an acquittal or unqualified dismissal in order to preserve such a claim. We have several difficulties with this ruling.

■ First, under New York law, while the favorable termination of judicial proceedings is an element of a claim for malicious prosecution, *see, e.g., Broughton v. State,* 37 N.Y.2d at 457, 373 N.Y.S.2d at 94, 335 N.E.2d at 314 ("elements of the tort of malicious prosecution [include] . . . the termination of the proceeding in favor of the accused"), it is not an element of a claim for false arrest, *see id.* at 456, 373 N.Y.S.2d at 93, 335 N.E.2d at 313–14; *Singer v. Fulton County Sheriff,* 63 F.3d at 118.

The common law tort of false arrest is a species of false imprisonment. . . . This claim is distinct from one of malicious prosecution: "each protects a different personal interest and is composed of different elements." [*Broughton v. State,* 37 N.Y.2d at 456, 373 N.Y.S.2d at 93, 335 N.E.2d at 314.] Under New York law, the elements of a false imprisonment claim are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.;* see also *Hygh,* 961 F.2d at 366 ("The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law.") (internal quotations and citations omitted). *A favorable termination of the proceedings is not an element of this tort.*

*Singer v. Fulton County Sheriff,* 63 F.3d at 118 (emphasis added). Thus, *Singer,* which was decided after the district court decision in the present case, makes clear that in order to pursue a claim for false arrest Larry was not required to show that the Town Court criminal proceeding ended in an adjudication that he was not guilty of the charges against him.

Although *Roesch v. Otarola* stated that a person who believes probable cause was lacking must pursue the case to an acquittal or unqualified dismissal in order to have a § 1983 claim for false arrest, *see* 980 F.2d at 853, we do not view *Roesch* as controlling the present case. First, *Roesch* involved events that occurred in Connecticut, whereas the events at issue here occurred in New York; and while it is clear under New York law, as set out by New York's highest court in *Broughton,* that favorable termination of litigation is not an element of a claim for false arrest, Connecticut law is less clearly settled. The *Roesch* court relied on a federal district court case, *Konon v. Fornal,* 612 F.Supp. 68 (D.Conn.1985), which in turn relied on a Connecticut Supreme Court case, *Clewley v. Brown, Thomson, Inc.,* 120 Conn. 440, 181 A. 531 (1935), that held a judgment of conviction to be a defense to a claim for either malicious prosecution or false arrest. Although one Connecticut intermediate appellate court, in analyzing the plaintiff's claim, listed favorable termination as an element of a claim for malicious prosecution but not as an element of a claim for false arrest, *see Lo Sacco v. Young,* 20 Conn.App. 6, 19–20, 564 A.2d 610, 617 , *cert. denied,* 213 Conn. 808, 568 A.2d 793 (1989), we are not aware of any opinion by Connecticut's highest court addressing the issue of favorable termination in the context of a claim for false arrest where there has been no determination as to guilt.

■ Second, the circumstances with which the *Roesch* court was concerned were entirely different from those at issue here. There, the claimant had secured the termination of an ongoing prosecution pursuant to Connecticut's accelerated pretrial rehabilitation statute. The considerations that led the *Roesch* panel to impose a favorable-termination-of-prosecution requirement in connection with a disposition similar to a settlement of the litigation are not applicable to a false arrest claim in circumstances such as Larry's, in which, because the information filed by Okst was insufficient even to give the Town Court

jurisdiction, there was effectively no prosecution at all. In sum, the ruling in *Roesch* is no impediment to our conclusion here that a person who asserts that he has been arrested without a warrant and without probable cause—a claim that does not seek to cast doubt upon judicial proceedings and is ripe upon arrest—need not insist that a prosecution be brought against him in order that he be allowed to pursue a claim for false arrest.

■ Nor was it appropriate for the district court to view the Town Court jury's verdict that Larry was guilty of resisting arrest as evidence that there was probable cause for his arrest. The Appellate Term reversed Larry's conviction, ordered repayment of any fine or surcharge paid by Larry, and ordered the information dismissed. Even a conviction that has been merely vacated, rather than reversed, with the matter remanded for a new trial, rather than dismissed, is "null and void, and the parties are left in the same situation as if no trial had ever taken place." *United States v. Ayres,* 76 U.S. (9 Wall.) 608, 610, 19 L.Ed. 625 (1869). *A fortiori,* a judgment that has been reversed, with instructions that the matter be dismissed, is null and void.

Finally, we note that Larry's conviction not only failed to survive appeal, it fell for a reason that made both the conviction and the proceedings leading to the verdict a nullity, for the Appellate Term ruled that the "information charging defendant with resisting arrest ... was ... insufficient on its face (*People* v. *Alejandro,* 70 N.Y.2d 133, 517 N.Y.S.2d 927, 511 N.E.2d 71)," *People v. Weyant,* No. 93–787 (N.Y.App. Term Nov. 15, 1993), *leave to appeal denied,* 83 N.Y.2d 811, 611 N.Y.S.2d 147, 633 N.E.2d 502 (1994), a defect that is "jurisdictional," *People v. Alejandro,* 70 N.Y.2d 133, 139, 517 N.Y.S.2d 927, 931, 511 N.E.2d 71, 74–75 (1987). *See also People v. McDermott,* 69 N.Y.2d 889, 890, 515 N.Y.S.2d 225, 227, 507 N.E.2d 1081, 1082–83 (1987); *People v. Case,* 42 N.Y.2d 98, 99, 396 N.Y.S.2d 841, 842, 365 N.E.2d 872, 873–74 (1977) (facially valid information is a prerequisite to a criminal prosecution, and that requirement is "nonwaivable"). Since the information filed by Okst was insufficient to give the Town Court jurisdiction, the pro-

ceedings against Larry in the Town Court were, for that reason as well, entirely void. *See, e.g., People v. Schildhaus,* 8 N.Y.2d 33, 36, 201 N.Y.S.2d 97, 99, 167 N.E.2d 640, 641–42 (1960) (the voiding of a conviction on ground that the information was jurisdictionally defective means that the judgment of conviction "must be regarded as a nullity"); *Hewitt v. Newburger,* 141 N.Y. 538, 543, 36 N.E. 593, 595 (1894) (reversing dismissal of claim for false imprisonment where the criminal information and warrant had failed to set forth a requisite element; the court entertaining the resulting criminal action was "wholly without jurisdiction, and the warrant and all proceedings under it were absolutely void"). "It matters not what the general powers and jurisdiction of a court may be; if it act without authority in the particular case, its judgments and orders are mere nullities, not voidable, but simply void, protecting no one acting under them, and constituting no hindrance to the prosecution of any right." *People ex rel. Tweed v. Liscomb,* 60 N.Y. 559, 568 (1875).

■ The district court's reliance on the Town Court verdict that Larry was guilty of resisting arrest to provide conclusive evidence, or any evidence, of probable cause was thus misplaced. The overturned verdict of a jury in a court without jurisdiction has no more juridical effect than a straw poll of pedestrians on the street.

### 2. *Reliance on the Officers' Version of the Events*

The district court also ruled that findings that Okst had probable cause to arrest Larry for disorderly conduct and resisting arrest were "warranted on the uncontested facts" (Tr. 20) because it was "more likely than unlikely" that there was probable cause (Tr. 23). Given the principle that, in ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d

202 (1986); Fed.R.Civ.P. 56(e) Advisory Committee Note (1963), we disagree with the district court and conclude that summary judgment was inappropriate as to the claim of false arrest with respect to both the charge of disorderly conduct and the charge of resisting arrest.

■ Under New York law, an essential element of the offense of resisting arrest is that the arrest allegedly resisted was "authorized." N.Y. Penal Law § 205.30 (McKinney 1988). To be "authorized" within the meaning of this section, an arrest must either have been made pursuant to a warrant or have been based on probable cause. *See People v. Alejandro,* 70 N.Y.2d at 135, 517 N.Y.S.2d at 928, 511 N.E.2d at 72 ("It is an essential element of the crime of resisting arrest that the arrest be authorized and, absent proof that the arresting officer had a warrant or probable cause to arrest defendant for commission of some offense, a conviction cannot stand...."). Since the predicate charge against Larry was disorderly conduct and there was no warrant, the validity of his arrest on either charge depended on the existence of probable cause to arrest him for disorderly conduct.

The disorderly-conduct section under which Larry was charged provides, in pertinent part, that

> [a] person is guilty of disorderly conduct when, with intent to cause *public* inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
>   ....
>
>   2. He makes unreasonable noise; or
>
>   3. In a *public place,* he uses abusive or obscene language, or makes an obscene gesture....

N.Y. Penal Law § 240.20 (McKinney 1989) (emphases added). This section was meant to proscribe disorderly behavior that is "of public rather than individual dimension," and it is limited to "situations that carried beyond the concern of individual disputants to a point w[h]ere they had become a potential or immediate public problem." *People v. Munafo,* 50 N.Y.2d 326, 331, 428 N.Y.S.2d 924, 926, 406 N.E.2d 780, 783 (1980) (reversing disorderly-conduct conviction of defendant who, in the presence of others but without endangering them, fired a gun from one point to another on his own property).

■ In the present case, though Okst contends that there was probable cause to arrest Larry for shouting obscenities near Indian Orchard Road, summary judgment based on acceptance of his contention was inappropriate for two reasons. First, the physical surroundings give rise to considerable question whether any disturbance caused by Larry could reasonably have been considered "public." Though Indian Orchard Road is a public road, the confrontation occurred on Larry's own land; the Property was gated and posted with "Private Property" signs; and Larry, Charles, and Cambareri informed the officers that the Property belonged to Larry. Larry's nearest neighbor was located a mile from the point where these events occurred. Larry, Cambareri, and Auberger, as well as another officer who was at the scene of the arrest, all gave evidence that, aside from the Weyants, Cambareri, the officers, and two tow truck operators summoned by the officers, no other persons were in the vicinity.

■ Second, there was sharp dispute as to the nature of Larry's conduct, to wit, whether he used obscene or abusive language or made unreasonable noise. Larry categorically denied using any obscenities; Cambareri's deposition testimony supported that denial. Larry also testified that he did not raise his voice. Although Okst and Auberger gave evidence to the contrary, the district court was not entitled, on a motion for summary judgment, to credit their version of the facts and enter judgment based on its own view that their version was more likely true. The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury. If a jury were to credit the testimony of Larry, Charles, and Cambareri, it would be entitled to conclude that it was more likely than not that when Okst arrested Larry for disorderly conduct and resisting arrest, he had probable cause for neither.

## B. Charles's Claim for Denial of Medical Care

The district court granted summary judgment dismissing Charles's claim for the denial of treatment for his serious medical condition on the grounds that Charles was required to show an unnecessary and wanton infliction of pain; that there was no evidence that Auberger intentionally violated Charles's rights; that it was reasonable for Auberger to follow Okst's instructions; and that the reasons given by Okst for not allowing Charles to receive such treatment "sound[ed] rational." (Tr. 22.) In light of the record, we conclude that the court should not have granted summary judgment.

In the context of a convicted prisoner, who has a right under the Eighth Amendment to be free from cruel and unusual punishments, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994). When Charles needed medical attention, he was a pretrial detainee, not a person who had been convicted, and hence the Eighth Amendment did not apply, *see generally City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The rights of one who has not been convicted are protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner. *See generally City of Revere v. Massachusetts General Hospital,* 463 U.S. at 244, 103 S.Ct. at 2983; *Bryant v. Maffucci,* 923 F.2d at 983. Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need. *See, e.g., Liscio v. Warren,* 901 F.2d 274, 276–77 (2d Cir.1990).

Deliberate indifference, in this context, may be shown by evidence that the official acted with reckless disregard for the substantial risk posed by the detainee's serious medical condition. *See, e.g., Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1978 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."). Thus, in order to establish deliberate indifference, a plaintiff must show "something more than mere negligence"; but proof of intent is not required, for the deliberate-indifference standard "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at ——, 114 S.Ct. at 1978. *See generally Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).

In the context of a claim under the Eighth Amendment, the standard for assessing deliberate indifference is a subjective one, requiring a determination as to whether the official knew of the risk to an inmate's health or safety. *See Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1979. Although the Supreme Court has not stated whether the same standard should be applied in the due process context, this Court in *Liscio v. Warren* used an objective standard, requiring determination of what the official knew or should have known, *see, e.g.,* 901 F.2d at 276–77 (despite pretrial detainee's failure to mention his alcoholism, physician was "on notice" that detainee might be suffering from alcohol withdrawal because he exhibited symptoms commonly associated with such withdrawal). Under either standard, the state of the defendant's knowledge is normally a question of fact to be determined after trial. *See, e.g., id.* (reversing grant of summary judgment); *Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) (reversing grant of summary judgment where, though the inmate-plaintiff eventually received medical attention, there was a question as to whether prison officials' five-hour delay in securing that attention constituted

deliberate indifference to the plaintiff's needs and suffering); *see also Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1981 ("Whether a prison official had the requisite knowledge of a substantial risk i[s] a question of fact subject to demonstration in the usual ways....").

██ In the present case, the record reveals the existence of material issues to be tried as to Charles's claim of deliberate indifference. Viewed in the light most favorable to Charles as the party opposing summary judgment, the record permits the inferences that, following his arrest, Charles was pale, dizzy, perspiring profusely, trembling uncontrollably, hardly able to talk, and repeatedly losing consciousness; that Auberger was informed that Charles was in insulin shock; that Auberger himself recognized that Charles was in sufficiently poor physical condition to cause Auberger to suggest taking him to the hospital; that Okst was informed that Charles was a severe diabetic in insulin shock and needed to go to the hospital immediately; that Okst nonetheless instructed Auberger to take Charles to the police barracks; and that Okst denied Charles medical attention throughout the period of his detention. The district court's indication that Okst's "decision [was] to take [Charles] to the barracks first *and then to the hospital*" (Tr. 22 (emphasis added)) ignored the evidence that after they arrived at the police barracks and Charles and Larry continued to urge that Charles be given medical attention, Okst did not have Charles taken to the hospital, did not provide any medical attention, and even prevented Helen from giving him all the help he needed to bring him out of shock.

While Okst proffered his own view that Charles's condition was not sufficiently serious to require immediate medical treatment, a view that the district court credited because Okst's explanation "sound[ed] rational" to the court, a jury need not credit Okst's testimony as to his observations or his attitude. For example, Okst submitted an affidavit stating that he had observed that Charles was "flush (*i.e.,* red faced)." (Affidavit of George S. Okst, dated November 29, 1994, ¶ 6.) If a jury were to credit instead the testimony of Larry and Cambareri that Charles was quite pale, it would be free to infer that Okst, having been told that Charles was in insulin shock and needed immediate attention, either did not even sufficiently look at Charles to assess his condition, or was not being truthful and had in fact observed Charles's need for prompt medical attention but recklessly disregarded that need.

██ Finally, we note that the district court found that it was reasonable for Auberger to follow Okst's instruction not to take Charles to the hospital, and that any violation by Auberger of Charles's right to medical treatment was "no[t] intentional." (Tr. 17.) This ruling applied an erroneous legal standard, for as discussed above, conduct may have been deliberately indifferent if it was reckless though not intentional. And while the present record suggests that Auberger showed some concern for Charles's condition whereas Okst did not, a jury would be free to infer that Auberger's obedience to the instruction of Okst, who although a paramedic did not examine Charles, was not reasonable but reckless.

In sum, on the record taken in the light most favorable to Charles, a reasonable jury could infer that Okst and Auberger received information, and could see for themselves, that Charles was in serious need of immediate medical care and yet denied him such care because they were deliberately indifferent to that need. Summary judgment was thus inappropriate.

## C. *Other Contentions*

Auberger and Okst argue that the dismissal of the false-arrest and denial-of-medical-treatment claims may be upheld on the basis that they were entitled to qualified immunity. We conclude that the genuinely disputed factual issues preclude summary judgment in their favor on this ground as well.

██ In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *See, e.g., Anderson*

*v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). The availability of the defense depends on whether " 'a reasonable officer could have believed' " his action " 'to be lawful, in light of clearly established law and the information [he] possessed.' " *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039–40). Qualified immunity does not protect those who are " 'plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. at 229, 112 S.Ct. at 537 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

■ At the time of the events in the present case, the legal principles governing defendants' conduct, discussed in Parts II.A. and II.B. above, were well established. The matter of whether it was reasonable for the officers to believe their actions met the standards set by those principles depends on whether one believes their version of the facts. That version is sharply disputed, and the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law.

Larry, in addition to challenging the summary dismissal of his claim for false arrest, contends that he should have a new trial on his claim against Okst for use of excessive force because the district court erroneously instructed the jury that his arrest was authorized. Larry did not object to that instruction at trial and hence has not properly preserved that contention for appellate review, *see, e.g., Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992) ("Absent objection, an error may be pursued on appeal only if it is plain error that may result in a miscarriage of justice, or in obvious instances of ... misapplied law." (internal quotation marks omitted)), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). Since the use of excessive force is impermissible even during a lawful arrest, we are not persuaded that the court's statements that Larry's arrest was authorized had a substantial impact on the jury's assessment of the excessive-force claim or that the unobjected-to

error must be reviewed in the interests of justice.

## CONCLUSION

For the foregoing reasons, we conclude that summary judgment dismissing the claims for false arrest and denial of medical care was inappropriate. To the extent that the judgment dismissed those claims, it is vacated, and the matter is remanded for trial of those claims. In all other respects the judgment is affirmed.

Costs to plaintiffs.