**ST. PAUL FIRE AND MARINE INSURANCE CO., Plaintiff,**

v.

**111 TENANTS CORPORATION, Defendant.**

**No. 01 Civ. 8835(GEL).**

United States District Court, S.D. New York.

May 28, 2003.

Lon A. Berk, William A. Schreiner, Jr., Shaw Pittman LLP, McLean, Va., for Plaintiff St. Paul Fire and Marine Insurance Co.

Joshua L. Mallin, Angela C. de Cespedes, Weg & Myers, P.C., New York City, for Defendant 111 Tenants Corp.

*OPINION AND ORDER*

LYNCH, District Judge.

Plaintiff St. Paul Fire and Marine Insurance Company ("St.Paul") seeks a declaratory judgment that the costs incurred by defendant 111 Tenants Corporation ("the

co-op") in replacing the gas distribution system in its cooperative apartment building at 111 East 75th Street in Manhattan are not covered by the co-op's "all risks" policy with St. Paul. The co-op counterclaims for the amount it expended on the replacement. The parties have cross-moved for summary judgment. Because the losses here come within the policy's exclusion for losses arising from deterioration of covered property, St. Paul's motion will be granted.

*BACKGROUND*

On July 24, 2000, the superintendent of the co-op, Daniel Orszulak, smelled gas in the basement of the building and reported it to Consolidated Edison ("Con Ed"), the co-op's gas utility company. A Con Ed inspector found a leak in a gas line immediately above one of the 38 basement gas meters, and shut off the building's gas supply. As required by the New York City administrative code § 27–922(d), the entire gas piping system was tested at about six times the normal pressure before service was restored. When the required tests were conducted, 32 of the 38 gas risers leading from the basement to the apartments failed; in a second round of testing performed by a different contractor, 27 of the risers failed again. The co-op accordingly undertook to replace the entire gas distribution system, and submitted a claim to St. Paul for the ensuing costs, which totaled $358,000.00.

St. Paul argues that it has no obligation to cover the cost of replacing the system because the "all risk" policy expressly excludes losses "caused or made worse by ... deterioration [or] any quality ... that causes [the covered property] to deteriorate or destroy itself." (Schreiner Affid. Ex. 1 ("Policy"), at STP 00071.) Alternatively, St. Paul argues that the loss here is not covered because it comes within a policy provision that, it argues, excludes losses due to "testing." (P. Mem. at 11.) For reasons unclear to the Court, St. Paul does not rely on the policy's exclusion for "loss caused ... by the enforcement of any ordinance ... governing the ... repair ... of any property." (Policy, at STP 00069.)

The co-op argues in response that (1) a triable issue of fact remains as to whether the initial gas leak was due to deterioration; (2) even if the first leak was due to deterioration, the large number of leaks detected during the subsequent testing were actually caused by the high gas pressure used during the testing itself.

*DISCUSSION*

I. *Summary Judgment Standard*

When adjudicating a motion for summary judgment, a court must resolve any ambiguities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

II. *The "Testing" Exclusion*

■ Both parties in this action misconstrue the obvious intent of the policy's exclusion of losses due to "Defects—Programming Errors." That provision reads:

> We won't cover loss caused by or resulting from:
>
> • defects or errors in the materials, design, development, distribution, processing, manufacturing, workmanship, testing, installation, alteration, or repair of covered property;
>
> • errors in systems programming; or
>
> • errors in instructions to a machine.

(Policy, at STP 00068.) The co-op argues that, since the heading refers to "Programming," and since the second and third bullet points underneath appear to relate to computer equipment, it somehow follows that the first item must also be limited to such equipment. Thus, claims the co-op, this exclusion does not apply to the situation at hand.

St. Paul's characterization of this interpretation as "strained" (P. Mem. at 8) is understated; the co-op's argument is untenable. The paragraph may be clumsily constructed, in that it includes certain exclusions specific to computers or machinery under the umbrella of a much more general exclusion for defects. But the first bullet point expressly applies to all "covered property," not merely computers, and there is nothing unique to computerized machinery about the sorts of "defects or errors" excluded by the provision. The co-op's reliance on the heading "Defects—programming errors" to suggest that the second term limits the first is also misplaced. The same typographic convention is used elsewhere in the Policy in headings over lists enumerating independent and alternative grounds for exclusion. For example, a paragraph headed "Settling—smog" excludes losses caused by smog *or* by "settling . . . of a pavement, foundation, wall, roof, or ceiling." (Policy at STP 00070.) Similarly, the exclusions in the "Defects—programming errors" paragraph are independent, and the first bullet point applies to defects in all covered property, including the gas system, not only to computers.

■ St. Paul's preferred reading of the exclusion is no more persuasive, however. St. Paul elides the paragraph to claim that the Policy "expressly excludes coverage for . . . loss 'caused by or resulting from . . . testing.' " (P. Mem. at 1.) But the syntax of the exclusion will not bear that interpretation. The word "testing" clearly forms part of the completion of the prepositional phrase modifying "defects or errors," in parallel with "materials, design, development," etc. That is, the term excludes not "loss caused by or resulting from . . . testing," but "loss caused by or resulting from: defects or errors in the . . . testing . . . *of covered property.*" However, neither party claims or has provided any evidence suggesting that there were any "defects or errors" in the testing performed by either contractor. If the normal and proper conduct of tests required by the building code produced (or merely revealed) leaks, this exclusion does not apply.

III. *The Deterioration Exclusion*

■ The only evidence in the record concerning the cause of the leaks consists two experts' reports proffered by St. Paul. Both experts concluded, through a process of elimination, that the underlying cause of all of the leaks here, and the exclusive

cause of the July 2000 leak that initiated the entire chain of events, was deterioration rather than any external event. The system, as far as anyone can tell, was over 80 years old in 2000. (Urinyi Affid. ¶ 20.) According to a report prepared about four months after the initial leak by the engineering firm of Wiss, Janney, Elstner Associates, the possible causes of gas leaks in general are (1) "external events" such as "vandalism ... building movement, structural distress, settlement, undermining, and collapse," and (2) "serviceability concerns" that can be "readily repaired with routine maintenance," such as "loose fittings, cracks, corrosion, or broken welds." (Urinyi Affid. Ex. 2 at 6 ¶ 8.) Any external causes, however, would be accompanied by other "indicators," which were not present here. (*Id.; see also id.* at 4 (noting absence of bending, distortion, or kinks in piping, absence of "loss of piping support hangers," and absence of "apparent distress to structure of building" or to "building finishes, such as paint damage or jammed doors").) By this process of elimination, the "most probable" causes would be such matters as "loose fittings, cracks, or broken welds" (*id.* at 5 ¶ 6) that are matters of "routine maintenance" (*id.* at 6 ¶ 8). Another engineering firm, MU Associates, in a report prepared a year after the initial leak, similarly reported that a leak could in general be caused by vandalism, settlement, or improper support, but found "with reasonable scientific probability" that these were not the cause because of the absence of evidence supporting such conclusions. (*Id.*, Ex. 3, at 6, 8–9.) The MU Associates report further ruled out corrosion because it observed that the piping was in good condition. (*Id.* at 9.) MU Associates concluded that "with reasonable scientific probability," the failure was "due to the normal drying of the sealant used to join the threaded pipe and threaded fittings." (*Id.* at 10.)

The co-op presents no evidence to contradict these conclusions. Instead, it argues that the evidence presented by St. Paul is "conclusory" and thus insufficient to carry its burden of proving that the exclusion applies. (D. Mem. Opp. at 11.) While the co-op is correct that St. Paul's experts do not provide affirmative evidence of the cause of the leaks, one of them identifies a specific type of ordinary deterioration as the cause "with reasonable scientific probability" (Urinyi Aff. Ex. 3 at 10), and that opinion is supported by a rational process of elimination of alternative causes that is consistent with the findings of both experts. The co-op, in contrast, presents no evidence of any external cause of the leaks and no coherent challenge to St. Paul's experts. In the absence of any challenge to the credibility or clarity of the engineering studies, the co-op must, to establish a genuine issue of fact, suggest at a minimum a specific alternative cause that (1) would render this a covered loss and (2) was overlooked by the engineers in their process of elimination. Otherwise, there are no "reasonable inferences" to be drawn in the co-op's favor that would defeat summary judgment. *Weyant,* 101 F.3d at 854. With respect to the initial leak, the co-op has not suggested any cause not considered and ruled out by the engineers. *Cf. Cigna Property & Cas. Ins. Co. v. Bayliner Marine Corp.,* Dkt. No. 92 Civ. 7891(AGS), 1995 WL 125386, at *9–*10 (S.D.N.Y. Mar. 22, 1995) (citing, in findings after bench trial, specific facts overlooked by expert in eliminating "other reasonable causes of the fire").[1]

1. The co-op argues that the absence of any affirmative evidence that the sealant had in fact deteriorated renders this record "insufficient as a matter of law" for a grant of summary judgment to St. Paul. However, the only "law" it cites is an unpublished opinion of a New York trial court, whose text is unavailable on any database accessible by this Court, and for which the co-op has not pro-

The co-op does present an alternative cause for the subsequent, additional leaks detected during the high-pressure testing: the excessive pressure of the testing itself. The co-op claims that "the pipes were in good working order until enhanced pressure testing was administered" (D. Mem. Opp. at 16; D. Cross–Motion Mem. at 13), and relies on *20 East 35 Owners Corp. v. Great American Insurance Co.*, Dkt. No. 95 Civ. 2642(KTD), 1996 WL 438172 (S.D.N.Y. Aug. 5, 1996), where a single gas leak led to a shutdown of the gas distribution system and the required high-pressure testing. In *20 East*, the court held that an all-risks policy covered repairs that were carried out in order that the system pass the tests. Unlike the instant case, however, (1) the *initial* leak was caused by a drilling accident, and (2) the plumber determined *prior* to high-pressure testing that the system would not pass the test unless all the gas cocks, which had become worn with age, were replaced. *Id.* at *2. The court found that, since the cocks functioned adequately under normal usage, and the anticipated leakage would only occur under the high-pressure conditions of the testing, the "damages complained of ... resulted not from deterioration or wear and tear, but from the [original] rupturing of the gas pipe," which occasioned the need for testing and was a covered event under the policy. *Id.* at *3.

Thus, *20 East*, properly understood, does not support the co-op's position. The court held that, for the purposes of analyzing an exclusion from "all-risk" insurance coverage, the gas cock leakage was attributable, for insurance purposes, not to the testing, but to the (covered) drilling accident responsible for the shutdown of the system and the legally-mandated testing that in turn necessitated replacement of the entire system. *20 East* thus turned on the fact that the initial leak was due to a covered event rather than the wear and tear or deterioration. It does not require a finding that testing-induced repairs are a covered loss here, where the initial leak leading to the testing was caused by deterioration.[2]

At any rate, the argument that damages sustained during properly-conducted, legally-required testing are covered by an all-risks policy is unsustainable. The co-op maintains that the system did not leak during "normal" usage, and thus that there was no loss until the testing was conducted. But the ordinance requiring testing at greater than normal pressure embodies a

vided a slip opinion. (D. Mem. at 13, citing *375 Riverside Drive v. Firemen's Insurance Co. of Washington, D.C.*, 277 A.D.2d 1062, 716 N.Y.S.2d 349, 2000 WL 1723950 (2000)); the Westlaw cite provided is actually to a First Department ruling that merely notes "Appeals withdrawn."

2. In this case, as in *20 East*, the policy excludes coverage for losses "caused directly or indirectly by the enforcement of any ordinance, regulation, or law governing the use, construction, repair, or demolition of any property." (Policy, at STP 00069.) An Endorsement to the policy excepts from this exclusion losses to the *undamaged* portion of a building caused by enforcement of an ordinance, but only if the loss to the *damaged* part of the building is otherwise covered by the policy. (Policy, at STP 00079.) *Cf. 20 East*, 1996 WL 438172, at *4 (citing similar policy language). Thus, if the initial gas leak – the "damaged" part of the building – *had* been covered by the policy (as it was in *20 East*), the multiple leaks caused by testing of the rest of the system – the part of the building undamaged by the initial event – could be a covered loss. But here, the record unambiguously points to deterioration of the system as the cause of the initial gas leak, and that loss is not covered by the policy. Thus the Endorsement's exception does not apply, and the Ordinance exclusion does.

legislative determination that a gas system that leaks under the more extreme conditions should not be put back into service, and must be repaired or replaced. So even if the concluding language used by MU Associates – "[t]he age of the gas piping and the higher pressure used during the testing would cause the sealant to fail" (Urinyi Affid. Ex. 3, at 10) – supports a finding that the testing caused the extensive leaks,[3] it anyway establishes that the testing revealed conditions that, by statute, rendered the system intolerably prone to new leaks. It is that underlying noncompliance with the Building Code that required replacement of the gas distribution system; the testing merely exposed it. The co-op presents no evidence that the system's weaknesses were the result of anything other than the deterioration and wear-and-tear found by the insurer's experts.

This conclusion is consistent with two similar cases that have been decided in this District, *61 Jane Street Tenants Corp. v. Great American Ins. Co.*, Dkt. No. 00 Civ. 1049(GEL), 2001 WL 40774 (S.D.N.Y. Jan. 17, 2001), and *415 East 80th Street Housing Corp. v. Agricultural Insurance Co.*, Dkt. No. 94 Civ. 4021(TPG), 1997 WL 139485 (S.D.N.Y. Mar. 27, 1997). In *61 Jane*, the co-op contended that the "system was working well despite [its] defects" and argued that therefore the shutoff of the gas system (which was necessitated by a small fire that had not itself damaged the system) was the relevant cause of the leaks detected during the required testing. *61 Jane*, 2001 WL 40774, at *5. The court rejected this characterization, noting that "Had the building's gas delivery system been up to code," the expensive repairs would not have been necessary. (*Id.*)[4] In *415 East*, 1997 WL 139485, at *1, the court cited an engineer's opinion that "pressure testing had revealed the leaks [in 19 apartments], but did not cause them," and thus found that a wear and tear exclusion in the "all risks" policy applied. While the co-op distinguishes *415 East* on the grounds that the engineer's report states unequivocally that the testing "revealed" leaks, and not that it "caused" them (D. Mem. at 15), the fact that a gas system is by statute required to pass the high-pressure tests renders this a distinction without a difference: A gas distribution system is in need of replacement or repair once it has deteriorated to the point where the required testing will show leaks, and the arrival at that state of disrepair is the "loss" for which the co-op seeks indemnification from St. Paul.

Accordingly, the replacement of the gas system was the result of ordinary deterioration and is therefore excluded from coverage, and St. Paul is entitled to judgment as a matter of law.

3. While the cited language could be read to support such a finding, it could also be read otherwise. The report earlier opines that "When testing the gas distribution lines in older buildings, ... gas leakage will be *detected* due to the normal drying of the pipe sealant...." (Uranyi Affid. Ex. 3, at 8 (emphasis added).) Whether the gas leaks identified during the testing were pre-existing leaks discovered by the high-pressure testing or were new leaks caused by the gas pressure used in the tests themselves is a factual question. Accordingly, for purposes of this motion, the reading more favorable to the co-op is assumed.

4. In *61 Jane*, moreover, the policy had been amended to exclude costs "associated with the enforcement of any ordinance or law which requires any Insured or others to test plumbing, gas or other building systems for integrity or condition." *Id.* at *3.

*CONCLUSION*

For the above reasons, plaintiff's motion for summary judgment is granted, and defendant's motion is denied.

SO ORDERED.