Louis MISTRETTA, Plaintiff,

v.

Police Officer Christopher J. PROKESCH, Sergeant Anthony Napolitano, Lieutenant Robert Hendrickson, County of Suffolk, et al., Defendants.

No. 94–CV–2816 (JG).

United States District Court, E.D. New York.

May 12, 1998.

Albert A. Gaudelli, Forest Hills, NY, Thomas A. Illmensee, Garden City, NY, for Plaintiff.

Robert J. Cimino, Suffolk County Attorney, Hauppauge, NY By Garrett W. Swenson, Jr., Assistant County Attorney, for Defendants.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

On June 14, 1994, plaintiff Louis Mistretta filed the complaint in this case. His claims arose out of events that occurred on June 15, 1993, when he was arrested at his home. He asserted claims of false arrest, malicious prosecution and unlawful arrest in his home without a warrant, in violation of 42 U.S.C. § 1983 and state law.

The malicious prosecution claims were dismissed prior to trial. The remaining claims were tried to a jury on January 26 and 27, 1998. The plaintiff's case took less than a day and one-half, which also included jury selection. Plaintiff called five witnesses: himself, the attorney who represented him on the day of the arrest, and the three defendant police officers.

At the close of the plaintiff's case, the defendant officers and the municipal defendant, Suffolk County, moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. After oral argument of the motion, I granted it in its entirety. This memorandum sets forth my reasons.

### THE FACTS

Viewed in the light most favorable to the plaintiff, the facts are as follows:

Beginning in 1991, the 28–year marriage of plaintiff Louis Mistretta and his wife, Marianne Mistretta, began unraveling. By 1993, their matrimonial problems were in full swing. The severity of those problems was evidenced by plaintiff's discovery on the morning of June 15, 1993, upon his return from a business trip, that his wife had changed the locks on his home at 22 Oak Lane in Blue Point, New York.

At the time, plaintiff was living at that address with his two adult daughters, Lisa and Diana.[1] Earlier in 1993, Marianne had moved out of the house, which she owned jointly with plaintiff, and Diana had moved in. When she moved in, Diana stored in the basement some of the furniture she had acquired while living elsewhere.

No one was home (except for Diana's dog) when plaintiff found himself locked out of his house. Plaintiff found a pay telephone and contacted his lawyer's office, finding out that the lawyer had not received any paperwork authorizing Marianne's tactic. Plaintiff then went back to the house and broke into it by removing a pane of glass from the back door.

Plaintiff discovered that locks had also been replaced within the house, requiring him to break into the basement, the master bedroom and the garage. He found that his clothes had been removed from the closets and placed in plastic bags or just thrown around the house. He thought Marianne might have moved back in while he was away.

After breaking into the basement, plaintiff went down the stairs. His "stuff" had been thrown around. He went to check a half-finished basement room where, he said, he kept some of his clothes. However, he could not open the door, not because it was locked, but because a piece of furniture was propped up against it on the other side. Plaintiff forced the door open and damaged the piece of furniture.[2]

Plaintiff used the telephone to find out from Lisa where Diana worked, and then to call Diana. Diana said she had nothing to do with changing the locks and that Marianne had done it. Diana admitted that she had known about it, and then hung up on her father.

Not long after that, Diana appeared at the house with two police officers. The officers said Diana lived there and wanted to continue living there. Plaintiff, who testified that he was "pissed off," but not "angry." Tr. 237,[3] told the officers that "this was a situation where I got locked out and I got to be out of my mind to let her back in right now so she can lock me back out again." Tr. 183. The police officers said to Diana that she should wait for her mother to come, and all three left. Approximately 20 minutes later, Marianne opened the door. She was with defendant Police Officer Christopher Prokesch and Diana.

Before Marianne came to the house, she had gone to the 5th Precinct of the Suffolk County Police Department to make a complaint. Officer Prokesch, who was on duty in his patrol car, was told by the dispatcher to respond to the precinct to interview her. Before June 15, 1993, he had had no contact with, or knowledge about, any of the Mistrettas. Marianne told Prokesch that (a) her lawyer instructed her to change the locks on the house at 22 Oak Lane, which she owned jointly with plaintiff; (b) plaintiff had moved out of that house two months earlier; (c) he had returned to the house that day and broken into it; and (d) she wanted plaintiff arrested for breaking and entering or burglary. Prokesch, who at the time had been a police officer for six years, could not determine whether the complaint had merit, so he proceeded to the house with Marianne.[4]

After Marianne, Diana and Prokesch entered the house, they went into the kitchen,

---

1. For ease of reference and to avoid confusion, Louis Mistretta will be referred to as "plaintiff," and his wife and daughters (Diana Mistretta and Lisa Mistretta) will be referred to by their first names only.

2. On cross-examination, plaintiff conceded that there was no other means of access to that room. He said he had "no idea" how someone could wedge a piece of furniture against the door and still get out of the room.

3. "Tr." refers to pages of the trial transcript.

4. In this respect, and many others as well, the plaintiff's and defendants' versions of events diverge. Defendants contend that what plaintiff testified to be the first visit by police officers to the house—involving two officers and Diana, as described above—never occurred. Those officers have never been identified, and there is no documentary or other evidence of such police activity except for plaintiff's testimony. Prokesch testified that he went to the residence with Marianne, and that Diana was already there, arguing heatedly with her father, when Prokesch and Marianne arrived. For the purposes of the Rule 50 motion, I credit plaintiff's version of these events.

where plaintiff was going through some papers. Prokesch told plaintiff that he did not belong in the house. Plaintiff challenged him to prove it. Marianne chimed in that plaintiff did not belong there, and immediately called her lawyer. She was overheard saying "you told me he wasn't going to be here" and "my God, he's going to sleep here." Tr. 185. She hung up and began to walk down the hallway away from Prokesch and plaintiff. Plaintiff began to follow her but Prokesch insisted that he stay in the kitchen.

Prokesch asked plaintiff where he lived. Plaintiff said he lived in that very house. Marianne returned from upstairs and said "My God, he was in the bedroom." Tr. 185. She insisted that she wanted plaintiff out of the house. Then Diana said something plaintiff did not hear and the three Mistrettas began yelling at each other. "[A]ll of a sudden," plaintiff testified, "the policeman said 'Diana, Marianne, come over, I want to talk to you.'" Tr. 185. Prokesch told plaintiff to stay in the kitchen, while Prokesch conversed with the two women by the stairway to the basement. Plaintiff heard Marianne say that "there's got to be a way for us to get him out of here. He can't stay in this house." Tr. 186.

Prokesch told Marianne that he could not arrest plaintiff for breaking and entering or burglary because it was not clear to Prokesch that plaintiff did not have a right to be there. Diana then stated that she wanted her father arrested for breaking her property. She told Prokesch that her father, upset at being locked out, had begun removing her furniture from the basement and putting it outside the house. When Diana argued with her father about it, he threw a bureau belonging to Diana down the basement stairs. Upon hearing this complaint, Prokesch went into the basement and observed the damaged piece of furniture.

Prokesch came back upstairs and told Diana that she would have to make a sworn, written complaint if she wanted to press charges against her father. They exited the house and went to Prokesch's patrol car, where Diana completed a police department form entitled "Supporting Deposition of Civilian Witness." It charged plaintiff with Criminal Mischief in the Fourth Degree in that he damaged Diana's bedroom furniture by intentionally throwing it down the stairs, causing approximately $200 in damages.

After Diana executed her sworn statement, Prokesch informed plaintiff that he was being arrested on his daughter's complaint for breaking her furniture. Plaintiff testified at trial that Prokesch specifically identified a white piece of furniture as the damaged property, and that he told Prokesch that the damaged piece of furniture belonged to him and he could provide the receipt for its purchase.[5] Prokesch did not allow plaintiff to find the receipt.

At the time of the arrest, plaintiff was near the open front door of his house, in the hallway. Prokesch was outside by his patrol car, where he had taken the written statement from Diana. As plaintiff was walking toward the front door, on his way outside to retrieve something from his vehicle, Prokesch told him he was under arrest. After plaintiff exited the house, Prokesch placed him in handcuffs and brought him to the police station. As he was being handcuffed, plaintiff said to his daughter: "[P]lease, Diana, don't do this to me," and pleaded with her not to pursue a criminal charge against him. Tr. 165, *see also* Tr. 197.

Plaintiff was arrested too late in the day to be brought before a judge. While at the police station, he telephoned his attorney, who then came to the station. The attorney asked that Mistretta be released and given a

---

5. Here again, the testimony of plaintiff and Prokesch conflict. Prokesch testified that when he asked plaintiff if he owned the damaged furniture, plaintiff responded "it's my house. I can do whatever I want with it." Tr. 142. In addition, plaintiff himself gave conflicting versions of these events. His prior testimony, which was admitted at trial and not refuted by him, was that he never knew—and was not told—what piece of furniture he had allegedly broken. Tr. 217–18.

Plaintiff's conflicting testimony required me to inquire of his attorney which version he wanted me to credit for the purposes of this motion. *See* Tr. at 297–98. That inquiry produced yet a third plaintiff's version: "the police were vague in telling him precisely ... what item of furniture he was accused of damaging ... . He told the police officer that *if* it was this white piece of furniture, then I own that furniture." Tr. 298 (emphasis added).

"desk appearance ticket." The sergeant on duty, defendant Anthony Napolitano, asked plaintiff if he had another place to stay, and then declined to release plaintiff from custody unless he agreed not to return to the house at 22 Oak Lane for 24 hours.[6] His attorney appealed Napolitano's decision to defendant Lieutenant Robert Hendrickson, the commanding officer at the precinct, who backed the sergeant's decision. Plaintiff refused to agree to the condition. He was thus detained overnight, and he was released by a judge at his arraignment the next day. The charges against him were subsequently dismissed in the interests of justice.

At the time of plaintiff's arrest, the Suffolk County Police Department had a "proarrest" policy in dealing with domestic disputes. Prior to the implementation of that policy, police officers attempted to mediate disputes between spouses. Due to an increase in domestic violence, including "some very bad cases where spouses ... actually ended up being killed." Tr. 113, the police department adopted a policy of making arrests, rather than attempting to defuse the situation, when on-the-scene investigations of domestic disputes resulted in probable cause to believe a crime had been committed.

## DISCUSSION

### A. Taking The Case From The Jury

As I mentioned when I orally granted defendants' Rule 50 motion, I am mindful of the Second Circuit's admonition that it is preferable for trial judges to let cases go to juries before granting motions for judgment as a matter of law. *See Konik v. Champlain Valley Physicians*, 733 F.2d 1007, 1013 n. 4 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). This "recommended practice" promotes judicial efficiency by permitting the appellate court, should it disagree with a trial judge's assessment of the sufficiency of a plaintiff's evidence, simply to reinstate a verdict rather than to direct an entirely new trial. *Id.*

6. Plaintiff concedes that in June of 1993 he also owned an apartment building and a tavern. He testified that he had stayed overnight at those locations, as well as with a friend named "Bud-

However, the recommended course of letting a case go to the jury is not mandated by *Konik* or by Rule 50. And it is not cost-free; setting aside a jury's verdict can foster disrespect for the jury system. Here, three factors weighed against it. First, the efficiencies associated with avoiding a possible retrial are not nearly as great here as they were in *Konik*. That case involved a four-week trial; here, jury selection and the presentation of plaintiff's case took only a day and one-half. Second, for that very reason, I did not feel the need to take time to sift through the record before ruling on the motion. In longer cases, where that is necessary, the argument that the trial judge should charge the jury and let it deliberate in the meantime is stronger. Third, I did not regard the Rule 50 motion here as presenting a close call. If I had, I would have submitted the case to the jury.

### B. The Rule 50 Standard

A court may not grant judgment as a matter of law unless the evidence, viewed in the light most favorable to the nonmoving party, leads to but one reasonable conclusion. The court must grant the nonmoving party every reasonable inference that the jury might have drawn in its favor. Judgment as a matter of law is improper unless, properly viewed, the evidence points so strongly in favor of the moving party that no reasonable jury could fail to render a verdict in its favor of the other. *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 (2d Cir.1998).

### C. The False Arrest Claims Against Prokesch

Plaintiff seeks damages on the ground that Officer Prokesch subjected him to a false arrest in violation of both state and federal law. I conclude that, as a matter of law, Officer Prokesch had probable cause to arrest plaintiff, a circumstance that defeats these claims. Furthermore, with respect to the federal false arrest claim, I conclude that

dy," a girlfriend named Rosalie, and in his own van on various occasions prior to the day of his arrest.

Officer Prokesch's decision to arrest is protected by the doctrine of qualified immunity.

### 1. *Probable Cause to Arrest*

 The existence of probable cause to arrest is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* If the determination of whether an arresting ·officer had probable cause requires the resolution of disputed facts, the existence of probable cause is to be decided by a jury. *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998). Where there is no dispute as to the pertinent events and the knowledge of the arresting officer. probable cause may be determined as a matter of law. *Weyant,* 101 F.3d at 852; *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). Even where factual disputes exist, as in this case, a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest. *Cf. Tierney v. Davidson,* 133 F.3d 189, 194 (2d Cir.1998) (even where factual disputes exist, qualified immunity may properly be found as a matter of law if defendant is entitled to it even under plaintiff's version of the facts).

There is no dispute that Officer Prokesch was told by Diana that plaintiff had intentionally damaged her property in retaliation for being locked out of the house. It is also undisputed that Diana's sworn statement, if accepted by the officer, makes out the elements of criminal mischief in the fourth degree, which, under New York law, is defined as follows: "A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he has such right, he ... [i]ntentionally damages property of another

person ...." N.Y. Penal Law § 145.00 (McKinney's 1988). The heart of plaintiff's contention that there was no probable cause is that Prokesch "was presented with evidence ... that if there was any damage to any article of personal property, of necessity that would have been to the accused's property." Tr. 289. Put another way, plaintiff contends that his statement to Prokesch that the damaged furniture belonged to plaintiff, and not to another person, precludes a finding of probable cause. Tr. 288–89. I disagree.

 When an officer is advised of a crime by a person who claims to be, the victim, and that person signs a complaint accusing another, the officer generally has probable cause to arrest. *Singer,* 63 F.3d at 119. Indeed, as sources of information go, crime victims are among the most reliable; they usually can provide a first-hand, nonhearsay account of the criminal activity. *See Miloslavsky v. AES Engineering Society,* 808 F.Supp. 351, 355 (S.D.N.Y.1992) ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."), *aff'd,* 993 F.2d 1534 (2d Cir.), *cert. denied,* 510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993).

However, officers are not absolutely privileged to arrest upon a charge by any private individual who claims to be a victim. Some people have axes to grind. Thus, there is a caveat to the general rule: victim complaints ordinarily establish probable cause "absent circumstances that raise doubts as to the victim's veracity." *Singer,* 63 F.3d at 119; *Lee v. Sandberg,* 136 F.3d 94, 102–03 (2d Cir.1997); *see generally* 2 Wayne A. La Fave, *Search and Seizure* § 3.4(a), at 204–14 (3d ed. 1996 & Supp.1998) (hereinafter "LaFave").

The most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation. When such a relationship exists, and. is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer may need to investigate further. Empirical studies have revealed that to be precisely

what they do. *See* 2 LaFave, *supra,* § 3.4(a), at 213 (" 'In those cases observed where the police knew or became aware of such a prior relationship, they were hesitant to act without further investigation.' " (quoting Wayne A. La Fave, *Arrest* 277–78 (1965))).

This case illustrates this common-sense principle. The first complaint made to Officer Prokesch was Marianne's assertion that plaintiff had committed the crime of breaking and entering, or perhaps even burglary. The complaint was made by one spouse against another in the midst of divorce proceedings. The risk of a false accusation was apparent, and Prokesch acted accordingly. Although Marianne's statements to Prokesch at the precinct, taken at face value, may well have made out the elements of criminal trespass.[7] Prokesch felt that he had to investigate further. He proceeded to the house, questioned the plaintiff and decided not to arrest him because it was not clear to Prokesch that plaintiff had no right to be there.

Similarly, there was reason to doubt the veracity of Diana's accusation that plaintiff had broken her furniture. Again, the complaint had the virtue of coming from a victim with personal knowledge of the crime, but the motive to falsify an accusation was patent: the complainant's mother had just been told that her attempt to have plaintiff locked up was unsuccessful, and had stated that there "had to be a way" to get plaintiff out of the house.

Once again, however, Prokesch did not simply accept the accusation at face value. He was told that plaintiff, who concedes he was "pissed off" at having been locked out of his own house, had dragged a piece of Diana's furniture up the basement stairs and

then threw it back down the stairs. Prokesch investigated the complaint. He looked in the basement, where Diana said the act was committed, and saw the damaged bureau. Although plaintiff's counsel contended that a jury could disbelieve Officer Prokesch's testimony that he saw a damaged piece of furniture in the basement, plaintiff himself testified that there was damaged furniture there, and that he had damaged it.[8] Also, plaintiff did not contend that Prokesch did not enter the basement; to the contrary, he testified that he did not recall whether anyone had gone down there, and that Prokesch had conversed with Marianne and Diana "by the stairway for the basement." Tr. 186. In short, Prokesch's testimony that he had gone to the basement and seen damaged furniture is not inconsistent with—and is in important respects corroborated by—plaintiff's version of events. Indeed, in his statements to Prokesch, plaintiff never even denied throwing the furniture down the stairs; rather, he stated, in substance, that he had destroyed his *own* furniture.

Thus, Prokesch was on the scene shortly after the alleged crime. The accused was in an agitated state, with a retaliatory motive created by the events of the day. The victim signed a sworn complaint that the accused had intentionally damaged her property. She did so on a form that explicitly warned her that false statements in reporting a crime are punishable under the New York Penal Law.[9] Finally, the damaged property was also there at the scene. Those facts plainly established probable cause.

Plaintiff's statement that he, rather than Diana, owned the damaged property just as plainly did not vitiate probable cause.[10]

7. *See* N.Y. Penal Law §§ 140.00 and 140.05 (McKinney's 1988).

8. At the oral argument of this motion, plaintiff's counsel retreated from the conflicting testimony as to the *location* of the damaged furniture. Prokesch said it was at the bottom of the stairs. Plaintiff said it was wedged against the opposite side of the only door to a windowless storage room. Since that door opened into the room, and no one was in the room, plaintiff's version posed a riddle: how did the bureau get there? Rather than answer that riddle, which had confounded plaintiff on the witness stand, Tr. 204–

.06, plaintiff's counsel characterized plaintiff's testimony as "vague," and not "necessarily irreconcilable" with that of Prokesch. Tr. 293–94.

9. The Second Circuit has observed that this circumstance enhances the credibility of an informant. *See Lee,* 136 F.3d at 103 & n. 7 (citing *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

10. As noted above, Prokesch testified that plaintiff made no such claim, but rather stated, in substance, that he was free to do whatever he wanted in his own home. Prokesch also testified

First, it was a facially implausible assertion. Plaintiff testified that both he and his daughter had furniture in the basement. Plaintiff had been locked out of his own house, and held his daughter sufficiently responsible to refuse her access to the home earlier that day. His assertion that, in his pique, he decided to destroy his own furniture, not that of his daughter, could properly have been viewed by Officer Prokesch as ludicrous. It certainly would have been an odd way for plaintiff to cap off a bad day. An implausible exculpatory explanation by a suspect not only fails to defeat probable cause, it can help constitute it. *See* 2 LaFave, *supra*, § 3.6(f), at 327–29.

■ In any event, even if plaintiff's statement to the arresting officer did not have such a demonstrable ring of untruth (for example, if he had simply denied committing the crime), it would not have stripped the circumstances of probable cause to arrest him. It is hardly uncommon for people suspected of crimes to deny their involvement. When they do, police officers who have probable cause to arrest are not required to adjudicate disputed issues of fact on the spot, nor are they required to walk away. Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997). A suspect's denial of his suspicious behavior is a factor the officer may consider in determining whether probable cause exists, but it does not require the officer to forego arrest if the facts otherwise establish probable cause. *Criss v. City of Kent,* 867 F.2d 259, 263 (6th Cir.1988). To hold otherwise would allow suspects to avoid arrest simply by denying guilt. *Id.* The function of law enforcement officers "is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989). Accordingly, they have no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not defeat probable cause. *Torchinsky v. Siwinski,* 942 F.2d

257, 264 (4th Cir.1991); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995); *Grant v. City of New York,* 848 F.Supp. 1131, 1135 (S.D.N.Y.1994).

■ Finally, plaintiff contends that Officer Prokesch's decision to arrest the plaintiff was motivated by his desire to remove the plaintiff from the house, rather than by a desire to strictly enforce the criminal mischief statute. This is obviously correct; Prokesch's real motive was to defuse a highly combustible domestic dispute before it had a chance to escalate into violence. Although that seems to me to be a laudable motive, it is, in any event, irrelevant to the question of probable cause. *Lee,* 136 F.3d at 103 n. 5. The standard is an objective one. Even less savory ulterior motives are irrelevant as long as the facts available to the arresting officer satisfy the probable cause standard. *Cf. Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (holding that Supreme Court's prior cases "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*

In sum, I conclude as a matter of law that there was probable cause to arrest plaintiff.

#### 2. *Qualified Immunity*

■ "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996) (citations omitted). With respect to the objective reasonableness inquiry, Officer Prokesch "is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officers to believe that probable cause existed, or (b) that officers of reasonable competence could disagree

---

that if plaintiff had claimed to own the damaged furniture, he would have investigated the claim. For the purposes of this motion, I of course

regard plaintiff's testimony as true, and hold that the law did not require further investigation of plaintiff's claim.

on whether the probable cause test was met." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987). To overcome the defense of qualified immunity, a plaintiff "must show it to be 'obvious that no reasonably competent officer would have concluded that a[n arrest] should issue.'" *Thomas v. Culberg,* 741 F.Supp. 77, 81 (S.D.N.Y.1990) (quoting *Robison,* 821 F.2d at 921).

■■■ Having already concluded as a matter of law that there was probable cause to arrest plaintiff, it necessarily follows that I find it to be objectively reasonable for Proksch to believe his actions were lawful. Moreover, the case law makes it quite clear that he is immune from liability under § 1983 even if I am mistaken about the existence of probable cause.

Domestic violence is an enormous problem in our society, and we have only recently begun to deal with it head-on. Recent cases reflect the recognition that domestic disputes are extremely combustible, and call upon police officers to make extraordinarily difficult judgments in pressurized situations. The stakes are very high. There is no dispute that a meaningful percentage of domestic violence situations to which the police are called result, unless someone is removed from the home, in physical violence. Although plaintiff argues that the officers in this case should have known he was "not some crazy individual who's likely to commit a violent act," Tr. 308, in truth, it is very difficult to identify those "crazy individuals" before they do violence. The doctrine of qualified immunity protects offices who err on the side of removing one of the prospective combatants from the scene.

The best example of this is the recent case of *Lee v. Sandberg,* 136 F.3d 94 (2d Cir.1997). In that case Jean Lee and her husband, Richard Lee, attended a Thanksgiving dinner, at which someone commented that Mrs. Lee's diamond ring was small. Mrs. Lee became angry at her husband's failure to take immediate retaliatory action. Later that evening, back at home, they had another dispute—this one concerning which television channel they would watch—which resulted in a minor physical encounter and a call by her to the police. *Id.* at 97.

When the police arrived. Mrs. Lee, a psychiatric patient, was in her bathrobe. Her eyes were red and glassy, her speech slurred, and dried white saliva occupied the corners of her mouth. Her conversation with the officers included the diamond ring episode, causing her to cry over how small the ring was. Mrs. Lee gave inconsistent accounts of having been "pushed" by her husband, but stated she had no pain or bruise. She asked not be tied up or taken to the hospital. She was taken to her psychiatrist instead. *Id.* at 97–98.

Later that night, the police were summoned again to the Lee residence. Mrs. Lee reported to them that, after her return from seeing her psychiatrist, Mr. Lee gave her a "karate chop" on the forearm. Again, however, there was no physical evidence of any such contact. Mrs. Lee provided a written statement, but only after obtaining directions to the police station, as she wanted to file a complaint against the officer for making her go to the psychiatrist in her bathrobe. *Id.* at 98–99.

For his part, Mr. Lee was calm and cooperative throughout both of the officers' visits to the house. He reported that when Mrs. Lee returned from the visit to the psychiatrist, she accused him of stealing the diamond ring, told him he was " 'f——ed' and that he would be 'kissing her ass for the rest of her life.'" *Id.* at 99. Viewing the facts in the light most favorable to Mr. Lee, as the Second Circuit did, *id.* at 102, he not only told the police that he did not touch or harm Mrs. Lee, but he was one who summoned the police back to the home, *id.* at 99. Nonetheless, Mr. Lee was arrested and charged with disorderly conduct. He later brought an action for false arrest. *Id.*

The Second Circuit found that the arresting officer was qualifiedly immune. Because the officer had determined from the psychiatrist that Mrs. Lee, though slightly drunk, "was not dissociating" when she made her complaint that her husband had hit her, it was objectively reasonable as a matter of law to arrest him. *Id.* at 104. The Second Circuit concluded: "[G]iven the extraordinarily difficult judgment decisions that law enforce-

ment officer must make in domestic violence situations, and the presence of factors here that suggest that Mrs. Lee's statements were not incredible, we hold that as a matter of law, the State Trooper's actions were objectively reasonable." *Id.; see also Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir.1998) (the combustible nature of domestic disputes have caused courts to accord "great latitude" to an officer's belief in the lawfulness of his conduct).

If the doctrine of qualified immunity protected the arresting officer from civil liability in *Lee,* there can be no question that it protects Officer Prokesch here. At this stage, it protects him from liability; had the issue been raised on a motion for summary judgment, as it should have been, the doctrine would have served its other purpose: to protect him from the "harassing and expensive burdens of litigation." *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995).

D. *The False Arrest Claim Against Napolitano and Hendrickson*

Napolitano and Hendrickson had no involvement in the arrest of plaintiff. Plaintiff seeks to hold them liable under § 1983 because "they compounded the initial seizure" by conditioning his release on "station house bail" on his agreement to stay away from the house at 22 Oak Lane for 24 hours. Tr. 303.

"Station house bail" is colloquial for a mechanism provided by the New York Criminal Procedure Law ("CPL") for a post-arrest, pre-arraignment evaluation of the need for continuing the custody of an arrested defendant until she sees a judge. Section 150.20(2) of the CPL permits police officers to issue "appearance tickets" to persons arrested for low-level offenses. N.Y. C.P.L. § 150.20 (McKinney's 1992). The appearance ticket directs the defendant to appear before a designated court at a specified time. Section 150.30 of the CPL permits the police officer to condition the issuance of an appearance ticket on the posting of pre-arraignment bail. *Id.* § 150.30.

The issuance of an appearance ticket to a person arrested without a warrant is committed to the sound discretion of the police and is not mandatory unless the officer is unable to bring the defendant before the court with reasonable promptness. *See* Peter Prieser, Practice Commentaries, 11A N.Y. C.P.L. § 150.20, at 682–83 (McKinney's 1992); *People v. Bracken,* 129 Misc.2d 1048, 494 N.Y.S.2d 1021, 1022 (N.Y.CityCrim.Ct.1985).

Plaintiff does not contend that he had a constitutional or statutory right to release on the evening of his arrest. Also, he concedes that in many domestic dispute cases, it may be "eminently reasonable" for the police to condition release on a promise to stay away from the home. Tr. 308. However, he asserts that "in the overall context of this case, ... the real issue ... was posturing in the divorce to get control of the house and the police knew about this and under those circumstances to say you're not going home, then I think they've stepped over the line." Tr. 308. In arresting him, plaintiff claims, the police were "issuing either very temporary divorce rulings about possession of this premises or de facto orders of protection which, as the court knows, only the local courts can do." Tr. 307.

■ This argument is nonsense. There is no evidence from which a factfinder could infer even the slightest interest on the defendants' part in the Mistrettas' struggle for control of the house on Oak Lane, let alone an effort to influence that struggle. The undisputed evidence was that Napolitano and Hendrickson, aware that domestic incidents involving property damage often escalate to physical violence, Tr. 103, wanted to impose a 24–hour cooling-off period as a condition of plaintiff's immediate release. Their actions were eminently reasonable, and violated no federal or state law.

E. *The Payton Claim*

Plaintiff contends that, because he was arrested in his home without a warrant, the arrest violated the Fourth Amendment even if there had been probable cause. This claim also fails as a matter of law.

Although it is clear that, "absent exigent circumstances or proper consent, the police may not enter an individual's home without a warrant even if probable cause exists to support an entry to search or arrest," *Biernacki*

*v. Carter*, No. 95 C 1694, 1996 WL 727396, at *4 (N.D.Ill.Dec.16, 1996) (citing *Payton v. New York*, 445 U.S. 573, 588–89, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)), it also is clear that a third party with "common authority" over the premises may give consent to enter the home. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Charles v. Odum*, 664 F.Supp. 747, 751 & n. 4 (S.D.N.Y.1987). According to the Second Circuit, "a third-party consent to search will validate the search if two prongs are present: first, the third party had access to the area searched, and second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.), *cert. denied*, 506 U.S. 928, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992).

In opposition to this claim, Prokesch asserts, *inter alia*, that it fails because Marianne had common authority over the house and consented to his entry. There is no dispute that Prokesch was escorted into the house by Marianne. Thus, the only issue is whether she had authority to consent to his entry.

■ On this subject as well, plaintiff's testimony was all over the map. The trial record includes three sworn statements by him, none of which has been expressly disavowed. At his deposition in 1994, plaintiff testified that he told Prokesch that there was no reason for him to be at the house because Marianne "was more than welcome to be in the house." Tr. 233–34. In a sworn statement filed in 1996, plaintiff stated that he told Prokesch "that neither Marianne nor Diana belonged or lived there." *Id.* at 233. At trial, after acknowledging the foregoing statements, plaintiff agreed that Marianne's name was on the deed and "she had as much

right to be there as [plaintiff] did." Tr. 234. When asked which version of events he wanted me to credit for purposes of this Rule 50 motion, counsel asserted that plaintiff's position was that Marianne was a record owner of the house and that she had a right of access to it. Tr. 317–19. Accordingly, under the holding in *Davis*, Marianne had the authority to consent to Prokesch's entry into the house.[11] Because Prokesch entered the premises with the permission of Marianne, who had common authority over them, plaintiff's alleged violation of *Payton* fails as a matter of law.[12]

### F. *The Monell Claim*

■ Plaintiff asserts that Suffolk County's "pro-arrest" policy relating to domestic disputes violates § 1983. He does not contend that it offends the Constitution to have a policy of arresting, rather than mediating, when domestic disputes give rise to probable cause to believe a crime has been committed. Rather, he asserts that the existence of such a policy will result in arrests even when there is no probable cause:

> If the police are making decisions,—which, as the court has observed, are frequently difficult decisions, . . . about whether they will or won't arrest somebody, and they have a . . . specter of a policy behind them telling them to make an arrest, well, then, . . . it certainly can have an unconstitutional . . . Fourth Amendment effect. . . . It's got to affect their thinking.

Tr. 320.

This subtle argument has no merit. In essence, plaintiff contends that a legal policy is an illegal policy because, on a case-by-case basis, mistakes will be made in attempting to comply with it. If accepted, the argument would swallow the rule that "a municipality cannot be held liable under § 1983 on a

---

11. Moreover, even if Marianne did not have the actual authority to consent to Prokesch's entry, the undisputed " 'facts available to [Prokesch] at the moment . . . warrant[ed] a man of reasonable caution in the belief that [Marianne] had authority over the premises.' " *See United States v. Perez*, 948 F.Supp. 1191, 1201 (S.D.N.Y.1996) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Accordingly, Prokesch was entitled to rely on Mar-

ianne's apparent authority to consent to his entry. *Id.*

12. I therefore do not address Prokesch's additional arguments that the *Payton* claim fails because (1) Diana consented to his entry to the home; (2) when the circumstances establishing probable cause arise when the police officer is already in the home, *Payton* is inapplicable; and (3) he is protected by qualified immunity.

*respondeat superior* theory." *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). I therefore reject it, and the § 1983 claim against the county is dismissed.

### CONCLUSION

For the foregoing reasons, the Clerk is respectfully directed to enter judgment for the defendants on all claims.

So Ordered.