*816 RENDELL, Circuit Judge,
dissenting:
The majority engages in an extensive and well-reasoned assessment of the underlying legal principles relevant to the substantive due process standard to be applied in this custodial care setting. Unfortunately for Anthony Nicini, however, the majority does not appear to have considered whether the real-life controversy before us — whether Frank Cyrus’s conduct actually fell below this standard— should be heard or decided by a jury under the legal principles it espouses. This is because Cyrus was, in the majority’s view, merely negligent, and maybe not even that. I dissent because I believe that more than one reasonable inference can be drawn from the facts, including an inference of deliberate indifference that shocks the conscience, making it inappropriate to dispose of Nicini’s case on summary judgment. See United States v. Diebold, Inc., 869 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Having used Ni-cini’s case as a vehicle to explore and analyze a particularly complicated legal standard, have we given short shrift to, and failed to appreciate the complexities of, applying the legal standard to the facts of the case itself? I suggest that we have.
Nicini’s story as chronicled by the majority leads neatly to its conclusion that Cyrus was, at most, merely negligent. But there is more than one way to view or perceive what Cyrus did, or failed to do, in furtherance of his duty to Nicini, who, although not of “tender years” as the majority notes, was a suicidal and “high risk” adolescent in need of hospitalization or intensive outpatient care.[1] Due process is contextual and due process rules should not be applied mechanically. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 850, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Although mere negligence is not sufficient to be a substantive due process violation, “culpability falling within the middle range, falling from something more than negligence but ‘less than intentional conduct, such as recklessness or gross negligence’ ... is a matter for closer calls.” Lewis, 523 U.S. at 849, 118 S.Ct. 1708 (citation omitted). “[T]he fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference.” Doe v. New York City Dep’t of Social Servs., 649 F.2d 134, 143 (2d Cir.1981). Considering the facts in the light most favorable to Nicini, the non-movant, as we are required to do on summary judgment, it certainly appears possible that Cyrus’s conduct might cry out “indifference” to a reasonable jury. Indeed, whether or not a defendant’s conduct amounts to deliberate indifference has been described as a “classic issue for the fact finder” and “a factual mainstay of actions under S 1983.” Armstrong v. Squadrito, 152 F.3d 564, 577 (7th Cir.1998).[2]
*817 It is hardly a struggle to present the facts in a way that gives rise to an inference of culpability greater than mere negligence. An unrebutted expert report in the .record, which receives scant attention in the majority opinion, does much of the work for us. This 13-page, single-spaced report of psychologist Elliott L. Atkins, Ed.D., P.A., provides a detailed account of the facts and opines , unequivocally that Cyrus’s conduct was far more egregious than the majority suggests is conceivable. I believe that this unrebutted expert opinion evidence by itself can, and does, create a genuine issue of disputed fact sufficient to defeat Cyrus’s motion for summary judgment. See Thomas v. Neioton Int’l Enters., 42 F.3d 1266, 1270 (9th Cir.1994).[3] At the very least, however, the Atkins expert report takes us on a .guided tour through the record, including DYFS records and Cyrus’s own testimony, exposing what Cyrus knew or should have known about Nicini and the Morras and making it glaringly obvious that some investigation was necessary before placing a suicidal teenager in a home where children were permitted to “drink and party.”
Atkins focuses first on Nicini’s condition and particular needs. Nicini’s problems went well beyond those of the average troubled juvenile. As such, Nicini required a heightened level of attention by those[1] charged with responsibility for his care. The DYFS records depict Nicini as the victim of repeated physical abuse at the hands of his father. They explain how Nicini made several attempts at suicide and self-harm, including slashing his wrists and stomach, drinking peroxide, and ingesting pills. App. 212-214, 243-244. They reflect that Nicini had both long term and recent problems of such severity as to require intensive outpatient care, or, more likely, hospitalization. A DYFS-paid psychiatrist’s report from January 9, 1991 — shortly before Cyrus acquiesced in Nicini’s placement with the Morras — noted that Nicini:
[I]s actively suicidal, in a major depression, very impulsive and bored. Outpatient treatment is not enough.
App. 245.[4] Cyrus’s own contact sheet entry stated:
*818 Worker conferred with supervisor who directed worker to contact Crisis (JFK) for evaluation of Anthony Nicini today. Worker contacted parent (Helen Nicini) and advised her [sic.] recommendations of Dr. Trigiani and parent was asked to pick Anthony up from aunt’s home and take him to JFK Crisis — parent agreed to do this. Worker contacted JFK crisis and indicated that Dr. T’s evaluation and recommendation would be faxed to them — this was done. Worker advised parent (Helen) upon request of abuse unit that she would have to stay with child in case he needed to be admitted.
App. 222, 245.
Atkins also explains how Nicini escaped through the window of the JFK psychiatric unit, deciding by himself that he “didn’t feel like staying in the hospital.” App. 164, 224-225.[5] In addition to the medical evidence, Nicini’s relatives expressed concerns about Nicini’s severe health to DYFS and at the family court hearing, noting that Nicini was not likely to voluntarily succumb to the treatment he desperately needed. App. 160, 246-247.[6]
Cyrus acceded in Nicini staying with the Morras in the face of Cyrus’s awareness of Nicini’s “history of mistreatment, physical abuse, depression, self-destructive behavior and suicidality, as well as his protracted absence from school ... [and] the longstanding history of rejection, neglect, and abuse.” App. 248. Atkins explains that it should have been — and was — clear to Cyrus that a caregiver for Nicini needed to provide a secure, emotionally-stable, and supportive environment, and needed to be able to provide skillful and knowledgeable intervention. To determine whether the Morras could provide such an environment and intervention in light of Nicini’s high-risk ■ situation likely entails a heightened level of inquiry, interview and investigation.
As Atkins helps to document, however, Cyrus made little or no effort to discover whether the Morra householdfit any of the requisite characteristics. Cyrus failed to address the most basic issues when he interviewed the Morras after Nicini went to their home upon escaping from the hospital. Any information about the Cyrus-Morra interview comes from Cyrus himself because the routine written documentation of such an interview is curiously absent from the DYFS records.[7] Cyrus could not recall if he asked the Morras whether they had ever been arrested, convicted, or otherwise had contact with law enforcement, nor did he ask the Morras how long they had lived in New Jersey to gain perspective on the helpfulness of the PERP check, apparently because he “just didn’t think to ask them that.” App. 251. Instead, Cyrus remembered asking the Morras whether there was anything that would prevent them from becoming foster parents, to which he received a negative response. Cyrus did not ask what the Morras did for a living. He did not ask whether they owned or rented their residence. Cyrus could not even recall with certainty that he had talked to the Morras about Nicini’s mental health history. In essence, there hardly was a meaningful investigation, let *819 alone a heightened inquiry, of the Morras’ fitness to be Nicini’s caregivers. Does it not matter that Cyrus failed to make inquiries fundamental to placing any child, let alone a physically-abused and suicidal teenager in desperate need of a stable environment? Did this conduct merely fall below an acceptable standard, as the majority concludes, or was Cyrus indifferent over a period of several weeks when he should have detected a problem and when he could and should have acted?
Cyrus would have us forgive any weaknesses in his inquiry because “no one knew or even remotely suspected that the Morra home was a dangerous environment,” Brief for Appellee at 14, but the undisputed facts belie Cyrus’s assertion, at least for purposes of summary judgment. Putting aside whether Cyrus would have had reason to suspect that the Morra home was 'a dangerous environment had he asked them even one or two more basic questions, both of Nicini’s parents relayed express concerns to DYFS about the Morras, and about placing Nicini with the Morras. According to her deposition testimony, Mrs. Nicini had told Cyrus prior to the family court hearing about an answering machine cassette tape with a message to Nicini’s aunt from Nicini saying that he is “partying and having a good time over there drinking” at the Morra residence. App. 250. Mrs. Nicini says she also made Cyrus aware in advance of the family court hearing about:
[M]y other concerns about the’ drinking and the drug use that I felt went on over there, about the juveniles that hung around over there, young kids all hours of the night and how Danny used to come home from that place. ' I expressed a lot of concerns to him about the Morra home and Tony’s placement.
App. 250. Mrs. Nicini explained some of her concerns at the family court hearing:
■And now these people that he’s with now, the Morras, they have harbored my oldest son on several occasions when he had taken off, and at one point even have had their house surrounded and went in and got him. Now maybe he didn’t tell these people that he was runaway or anything. I don’t know them personally, only — only what I had heard. My oldest daughter knows — goes to school -with kids that are Mends with Eric Morra, them son, which I believe is 16 or 17, and I’ve been told that he’s into drugs. I. don’t know if it’s true or not, but it’s just what I’ve heard. I don’t know, something just seems strange about these people, why they would — -if they don’t know Tony, -why they would even take him in. I’m sure that Tony knows them through my oldest son Danny. '
App. 158-159. In light of Mrs. Nicini’s concerns, Nicini’s counsel commented that “maybe something should be looked in [sic.] with this Morra family, in light of what Mrs. Nicini had said I think maybe a closer investigation on whether or not that’s an appropriate placement for Anthony.” App. 168.
At the hearing, Cyrus acknowledged the existence óf Mrs. Nicini’s objections, but was somewhat dismissive, instead emphasizing that the Morras had an interest in Nicini and would not mind having him there, and that Nicini was stable at the Morra home. App. 155-156.[8] In any event, the information provided by Mrs. Nicini to Cyrus prior to the family court hearing apparently did not make a lasting impression on Cyrus, as he could not articulate her concerns about the Morras at his deposition:
[I]t seems like it is more like something that she had heard about him or heard *820 about the family or something like that, but I don’t know any specifics.
App. 250.
Mr. Nicini had expressed concerns to DYFS about the Morras as well. According to the deposition testimony of Nicini’s father, as recounted by Atkins, Mr. Nicini told DYFS that the Morra home was a “haven for runaway juveniles.” App. 250. DYFS records indicate that Mr. Nicini said the Morra home was not a good placement, although he would agree to weekend placement.[9] According to Mr. Nicini, this was not the first time he had ever relayed concerns about the Morras, an earlier time being in connection with Nicini’s brother Danny:
Q: If it was around 1988 give or take a year that Danny stayed or visited the Morra home, was it around that time in which you suspected that Mr. Morra was [sic.] pedophile?
A: I suspected that he was exploiting children.
Q: Did you suspect that there might be drugs in the household at that time? A: I felt that these children were going over there and in some way they had access to drugs and alcohol.
A: Around that time Danny was already involved wit h DYFS; is that correct?
Q: Yes.
A: Was his case worker Frank Cyrus at that time?
A: I believe so.
Q: Did you notify anyone at DYFS regarding your concerns that you have shared with me regarding the Morra household that there might have been some child sex there?
A: During what period?
Q: You indicated that Danny might have been staying at the Morra household and that you had your suspicions that there might be sexual abuse or some type of child abuse at the home; is that correct?
A: Yes.
Q: Did you notify or tell anyone at DYFS about tho se suspicions that you had?
A: I had mentioned it to a social worker....
Q: Do you recall what concerns or concern exactly you expressed to that person?
A: About the placement of children into foster care. My concern with my son as far as what he was doing.
App. 230-231.[10]
Mr. Nicini’s objections apparently left even less of an impression on Cyrus than Mrs. Nicini’s, as Cyrus initially disavowed in his deposition having any recollection of objections by Mr. Nicini to placing his son with the Morras. After having the aforementioned DYFS record entry read to him, Cyrus recalled that he was likely aware of Mr. Nicini’s objection but did not bother to pursue it further:
Q. Were you ever aware of that particular objection?
A. Yeah, I think I was, now that I read this over.
Q. Okay. Did you ever contact Mr. Ni-cini to discus s with him the basis of his objections?
A. No.
Q. Was there any reason for that?
A. No. No, I think, you know, like I was saying, w e were feeling, you know, good about the placement because everything was positive, everything was *821 pointing toward him doing well there and becoming stabilized and progressing, and so we had no real concerns at that time about that.
App. 228.
Failing to follow up on specific concerns communicated to him and to DYFS about the Morras as an acceptable placement for Nicini who, only weeks beforehand, was said to be actively suicidal and in need of hospitalization, Cyrus advocated that Nici-ni stay with the Morras, about whom he knew little or nothing, telling Judge Segal that Nicini was stable at the Morra house, that he was “doing very well there, no problems.” App. 155.[11] And, largely on the basis of Cyrus’s position and representations, Judge Segal ordered Nicini to remain with the Morras “for so long as [DYFS] thinks that’s an appropriate placement.” App. 167. Judge Segal had asked Cyrus if the Morras’ home would qualify as a para-foster home, to which Cyrus responded “[y]es they would.” App. 156. Although Cyrus qualified his answer by saying that the only thing he had done was a PERP check, Cyrus assured Judge Segal that “[tjhere’s no — nothing we’ve seen in terms of any problem with the law .... right now they are not an official foster family, although I’m sure they would— they would apply for para-foster custody if the parents are willing to let them.” App. 156-157. Cyrus explained again in his deposition that he had received updates from the Morras themselves. App. 226-227.
Concluding that the “background information available to Frank Cyrus which was completely ignored was substantial,” Atkins opines as follows at the conclusion of his detailed report.on Cyrus’s handling of Nicini’s case:
The ongoing disregard of pertinent information at various .stages of the investigation demonstrates not a simple negligent breach but a pattern of deliberate indifference to the right of Anthony Ni-cini to be secure in a safe environment and to be offered the same opportunity for protection/supportive services from DYFS as any other child.
App. 253.[12] ‘
Although this expert report illustrates how the facts could produce an inference of deliberate indifference, the majority swiftly dismisses the relevance of Atkins’ report in its entirety, apparently based on the fact that Atkins did not explain how Cyrus could have performed a national police search without the permission of the *822 Morras.[13] Interestingly, Cyrus would have obtained the requisite permission, or been confronted with the refusal of permission, had Cyrus conducted a proper interview at the outset and asked basic questions that reasonably should have been explored before entrusting Nicini to the Morras, such as those posed to a para-foster applicant. Yet, Cyrus neither asked the pertinent questions, nor sought permission to do the search, until it was too late.
The majority properly concludes, in my view, that Cyrus and DYFS had a special relationship with Nicini and thus were charged with affirmative duties. Nicini was in the care and custody of the state. However, in light of its recognition of this duty, and in light of what the facts and expert witness testimony suggest that Cyrus knew or should have known about Nicini and the Morras, can one so facilely conclude as well that no reasonable jury could infer “deliberate unconcern for plaintiffs welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse”? See Doe, 649 F.2d at 144; Taylor v. Ledbetter, 818 F.2d 791, 797 (11th Cir.1987) (en banc) (adopting Doe articulation of deliberate indifference and finding that a foster child may bring a section 1983 action alleging that government officials were deliberately indifferent regarding her foster home placement).[14] As the Supreme Court noted in Lewis, “[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.” Lewis, 523 U.S. at 853, 118 S.Ct. 1708. By rejecting the valid competing inference clearly raised by the facts and concluding at this juncture that Cyrus’s conduct was at most merely negligent as a matter of law, I believe the majority has short-circuited the process of addressing Anthony Nicini’s substantive due process rights.

. Other courts similarly have characterized this question as one for the fact finder when the issue is less than clear-cut. See, e.g., Weyant v. Okst, 101 F.3d 845, 857 (2d Cir.1996) (reversing grant of summary judgment because a reasonable jury could infer from the record, taken in the light most favorable to the plaintiff, that the defendants were deliberately indifferent); Wood v. Ostrander, 879 F.2d 583, 588 n. 4 (9th Cir.1989) (reversing grant of summary judgment because defendant's conduct could be construed to be deliberately indifferent; “a jury presented with these facts might find Ostrander’s conduct to have been 'deliberately indifferent,’ 'reckless,' 'grossly negligent,’ or merely 'negligent.' ”) (citing Fargo v. City of San Juan Bautista, 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence, or recklessness, the question is *817 one of fact to be decided by the jury.”)).. The Supreme Court recently likened section 1983 actions to tort claims for purposes of Seventh Amendment application, and explained that as a general historical matter, juries decided questions of liability, which "preserved the jury's role in resolving what was often the heart of the dispute between plaintiff and defendant.” City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 718-719, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999).

. See generally Chavez v. Cady, 207 F.3d 901, 905 (7th Cir.2000) (concluding that a material fact existed as to whether the treatment provided by the defendant was a substantial departure from accepted professional judgment based on the substance of the defendant's expert's testimony); Russo v. City of Cincinnati, 953 F.2d 1036, 1047 (6th Cir.1992) (reversing grant of summaiy judgment in section 1983 action alleging failure to train police officers, and noting that "expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures. To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting directly from its indifference to the rights of citizens. Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself.”). Compare Fagan v. City of Vineland, 22 F.3d 1296, 1307 (3d Cir.1994) (en banc) (affirming grant of summaiy judgment in police pursuit case, and noting that the only evidence introduced by the plaintiffs to show arbitrary, intentional, and deliberate action by the defendants was expert witness testimony, but their expert witness "expressly disclaimed any such characterization” of the defendants' conduct).

. During Nicini's family court hearing, Judge •Segal reported on a telephonic report from a TRIS worker who opined that Nicini was no longer depressed or suicidal at that particular time and had "made a fine adjustment to the location where he’s presently located,” but also mentioned that the "the option of placement in a longer term facility like the residential placement ... like Ranch Hope is a very good option” and noted that Nicini. needed continuing psychotherapy and perhaps antidepressants “if things do not clear up for *818 him.” App. 166-167. Judge Segal also noted that “all the doctor has is an assessment of Tony and he doesn't have a full basis on which to make an evaluation. But he had sufficient information from his assessment to indicate that it will be a long time before this boy goes back home.” App. 167.

.A psychologist at JFK held a bed for Nicini after he ran away, and the police picked up Nicini at the Morra residence, yet Cyrus gave Nicini permission not to go back to the hospital but, rather, to stay at the Morras’ home. App. 225, 246.

. .One of Nicini's aunts also stated at the hearing that she believed Nicini had attacked her daughter: "This isn't just something that’s happened all of a sudden, it's been going on for at least a year and a half ... and he doesn't mean this, he doesn’t.” App. 161.

. When asked about this absence, Cyrus said that he remembered "writing something, but I don't know if its in here or not.” App. 252.

. Indeed, it appears that Cyrus may have characterized the Morras as a friend of the Nicini family, although it is not entirely clear due to a possible error in transcription. See App. 154, lines 13-14. See also App. 155 (Cyrus explaining that Nicini "found his way to the Morras, who I guess was a friend of his.”).

. The DYFS record entry also reflected that Mr. Nicini was "not pleased, Anthony not in hospital. He’s going to call JFK Crisis to find out who psychiatrist is that released child.” App. 227.

. Mr. Nicini made clear in this deposition that he and his wife had never authorized Nicini's brother Danny to stay with the Mor-ras. App. 231.

. A jury might wonder on what basis Cyrus could report to Judge Segal that everything was positive. Cyrus's explanation seems to be premised on an assumption, embraced by the majority to some extent, that no further action was necessary to discharge his duties to Nicini as long as certain parties professed to be content. Nicini claimed he liked staying at the Morras, and, as Cyrus noted in his deposition, "Nicini refused to go elsewhere.” App. 145. The Morras were willing to have him remain there and reported that there were "no problems.” Of course, when the Morras gave that report to Cyrus, Mr. Morra already had been giving Nicini drugs and sexually abusing him, telling Nicini he would have no place to go if he disclosed these activities. App. 232, 238. Could not a jury find Cyrus's attitude to be an indictment rather than a satisfactory explanation for Cyrus's inaction? After all, on Cyrus's theory, a case worker would never unearth a problem until it is too late. Should not the concern have been the stability of the environment for this suicidal youngster who had just climbed out the window of the psychiatric ward, rather than whether he professed to be content there?- In light of Cyrus's weak and ineffectual — and perhaps even indifferent — responses provided with respect to the numerous signposts of potential danger with the Morra placement, it would not be difficult to imagine a jury concluding that Cyrus’s inaction rose to the level of deliberate indifference if, during a trial, Cyrus were to provide similar responses and to demonstrate a similar attitude.

. Atkins also opined that Cyrus's "multiple breaches constituted a pattern of indifference to his statutory and/or professional duty such that I conclude with a reasonable degree of psychological probability that this pattern of conduct arose not from mere negligence but from deliberate indifference to his obligation to conduct a proper investigation and directly caused the injuries claimed by Anthony Nici-ni.” App. 242

. The majority further characterizes the report as "focus[ingj ‘particularly’ ” on this issue "without pointing to specific facts from which Cyrus should have inferred that such a check was necessary.” I can only wonder whether the majority is reading the same detailed, comprehensive report that I have described.

. Although Nicini does not specifically challenge whether Cyrus complied with certain DYFS requirements ie.g., conducting a PERP check), and thus Doe is distinguishable in that respect, the substantive due process violation would be based on the state’s alleged failure to provide for basic human needs of those in its custody, see DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), regardless of whether the state has specifically regulated regarding all of those needs. Surely we do not allow states to defeat substantive due process allegations by setting minimal standards for child welfare case workers. Would it not violate substantive due process for a state welfare case worker, with the requisite level of culpability, to allow a child to starve before his eyes, notwithstanding the absence of a specific state regulation requiring the feeding of children in the custody of the state? In light of other evidence giving rise to a strong inference of deliberate indifference, the fact that Cyrus took certain minimal steps required by DYFS regulations will not, by itself, defeat that inference or remove Cyrus’s conduct from the realm of consideration.