**JPMORGAN CHASE BANK, Plaintiff,**

v.

**Lodwrick M. COOK, Defendant.**

**No. 03 Civ. 2690(GEL).**

United States District Court,
S.D. New York.

Feb. 20, 2004.

Andrew E. Tomback, Allan S. Brilliant, Millbank, Tweed, Hadley & McCloy LLP, New York City, for JPMorgan Chase Bank.

Terry Christensen, Patricia Glaser, Sean Riley, Christensen, Miller, Fink Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles, CA; Peter A. Mahler, Derfner & Mahler, New York City, for Lodwrick M. Cook.

### OPINION AND ORDER

LYNCH, District Judge.

This lawsuit concerns a $7.5 million personal loan that Lodwrick Cook, a senior executive at Global Crossing, Ltd. ("Global Crossing" or "GX") borrowed from JPMorgan Chase's private banking division and failed to repay. The parties agree that Cook borrowed the money and has defaulted on the debt. They dispute who can be held responsible for the loan,

which was made pursuant to a complex chain of agreements among Global Crossing, Cook, a consortium of lender banks and various JPMorgan Chase Bank[1] entities. The story is further complicated by JPMorgan Chase Bank's many hats in the transactions at issue: the private banking division ("Private Bank")[2] loaned Cook the money pursuant to a promissory note. JPMorgan Chase Bank ("JPM") issued a letter of credit to the Private Bank to guarantee the promissory note in the event Cook failed to repay it. JPM was one of the consortium of lender banks that supported the letter of credit pursuant to a revolving credit facility with Global Crossing; and JPM was also administrative agent of the consortium. Global Crossing's bankruptcy in the wake of financial scandals, and the resulting automatic stay, add the final twists to the issue of who can be held responsible to repay the money Cook borrowed.

JPM argues that under the doctrine of equitable subrogation it stands in the shoes of Private Bank and can pursue claims against Cook for breach of the promissory note. Underlying JPM's claims is the fact that JPM was a member of, as well as administrative agent for, the lender consortium that ultimately had to cover the $7.5 million under the terms of the letter of credit issued pursuant to Global Crossing's revolving credit facility. Private Bank drew down $7.5 million on the letter of credit, and was thus made whole for the defaulted loan. However, the revolving credit facility took the loss and now JPM, as issuer and/or administrative representative of the consortium of lender banks participating in the facility, seeks to recover $7.5 million directly from

Cook. As a practical matter, Global Crossing cannot be sued owing to the automatic stay in place as a result of its bankruptcy. Cook has moved to dismiss the complaint, arguing primarily that JPM was made whole for the loss, and that JPM has no standing to sue. JPM cross-moves for summary judgment on the ground that it is equitably subrogated to Private Bank, and that Cook breached the promissory note. The parties appeared for oral argument on the motions on July 22, 2003. For the reasons that follow, the motion to dismiss will be denied, and the cross motion for summary judgment will be granted.

## BACKGROUND

For purposes of the motion to dismiss, the facts in the complaint must be accepted as true. The Court also relies on certain documents appended to the Affidavits of Lodwrick M. Cook and Sean Riley, which, the parties agreed at oral argument, structured the relevant transactions. (Tr. 3.) *See* Affidavit of Lodwrick M. Cook, sworn to May 12, 2003 ("Cook Aff."); Affidavit of Sean Riley, sworn to May 15, 2003 ("Riley Aff.").

When this lawsuit was filed in April 2003, Lodwrick Cook was Deputy Chairman of Global Crossing, which had declared bankruptcy on January 28, 2002. Prior to becoming Deputy Chairman on December 31, 2002, Cook had been Co–Chairman of Global Crossing, a position he had held since April 1998.

On or about April 11, 2001, Global Crossing's Board of Directors approved a senior executive loan guarantee plan ("Loan Guarantee Plan") designed to allow

---

1. At the time the transactions at issue occurred, JPMorgan Chase Bank was known as The Chase Manhattan Bank.

2. The private banking division is an internal division of JPMorgan Chase, and not a separate corporation. However, in the interest of clarity, the Court will refer to that division simply as "Private Bank."

senior officers to borrow up to $7.5 million rather than liquidate their GX shares. The value of GX shares was declining, and the Loan Guarantee Plan was intended to allow senior executives to retain their shares by providing loans guaranteed by letters of credit backed by a $1 billion revolving credit facility maintained by Global Crossing, Ltd., Global Crossing Holdings, Ltd. and Global Crossing North America ("Revolving Credit Facility" or "Facility"). The Revolving Credit Facility had been created on August 10, 2000, as a line of credit Global Crossing could draw on for a variety of needs. JPM is a member of, as well as administrative agent for, the consortium of forty-four lender banks ("Lender Banks") that participated in the Facility. (Compl. ¶ 2, n. 2, Ex. B; Riley Aff., Ex. A (Credit Agmt.), Schedule 2.01 (listing the Lender Banks and their percentage participation in the facility).) The Revolving Credit Facility provides terms for letters of credit issued at Global Crossing's request. (Riley Aff., Ex. A (Credit Agmt.), § 2.05.)

On April 16, 2001, five days after the institution of the Loan Guarantee Program, Cook applied for the maximum $7.5 million loan, representing that he needed to cover an outstanding $14 million obligation on his and his wife's personal Salomon Smith Barney margin account, which was secured by GX stock. (Compl. Ex. A (Indication of Interest Form).) On July 26, 2001, Private Bank agreed to loan Cook $7.5 million upon delivery of a letter of credit issued pursuant to the Revolving Credit Facility. In other words, Private Bank would lend Cook the money if a letter of credit guaranteed that Global Crossing's Revolving Credit Facility would cover the loan in case Cook defaulted. (Compl. ¶ 10.) On that same date, at Global Crossing's request, JPM issued an Irrevocable Standby Letter of Credit in the amount of $7.5 million to Private Bank ("Letter of Credit"), pursuant to the requirements of the Revolving Credit Facility.[3] Upon delivery of the Letter of Credit to Private Bank, Private Bank extended Cook a $7.5 million loan. Cook simultaneously executed and delivered a promissory note ("Promissory Note") providing that the Loan was due and payable in full to Private Bank on July 5, 2002. (Compl. Ex. C (Promissory Note).)[4]

Also on July 26, 2001, Cook signed a reimbursement agreement ("Reimbursement Agreement") providing that he and his wife would reimburse Global Crossing "for the amount of any drawing on the [Letter of Credit] and for all costs and expenses incurred by [Global Crossing] in maintaining the [Letter of Credit]." (Cook Aff., Ex. D (Reimbursement Agmt.).) The Reimbursement Agreement further provided that until the Cooks satisfied their reimbursement obligations to Global Crossing, they would not transfer the rights to the approximately 2.5 million shares of GX stock which served as collateral for the $7.5 million Promissory Note. (Cook Aff., Ex. D (Reimbursement Agmt.).)

In sum, the agreements signed on July 26, 2001, in combination with the Credit Agreement, created a circular system of guarantees to back Cook's $7.5 million

---

**3.** According to the structure of the transaction, as reflected in the documents, JPM acted as the Issuing Bank when it issued the Letter of Credit, in addition to its role as Administrative Agent for the consortium of lenders when it performed other functions connected to the Revolving Credit Facility. (Riley Aff., Ex. A (Credit Agmt.), Art. VIII).

**4.** Cook also signed a collateral agreement on July 26, 2001, ("Collateral Agreement") pledging 2.5 million shares of GX stock held in his Salomon Smith Barney margin account as collateral for the Loan. (Cook Aff. in Opp. to Summary Judgment, sworn to July 18, 2003, at ¶ 5, and Ex. A.)

Loan. If Cook defaulted on the Promissory Note, Private Bank could present the Letter of Credit to JPM as Issuer for payment of the principle owed by Cook. Global Crossing, in turn, was obligated by the terms of the Revolving Credit Facility to reimburse JPM as the Facility's administrative agent for any sum drawn on the Letter of Credit. (Compl. ¶ 9, Ex. B (Letter of Credit); Riley Aff., Ex. A (Credit Agmt.), § 2.05(e).) And finally, the circle would close when Cook reimbursed Global Crossing for any amount Global Crossing paid to JPM as the Administrative Agent.

On January 28, 2002, approximately six months after Cook obtained the loan pursuant to the Loan Guarantee Program, Global Crossing and several affiliates declared bankruptcy. (Compl. ¶ 15.) The bankruptcy did not affect Cook's obligations under the Note. (Compl. ¶ 16.) On July 5, 2002, the date the Note matured, an event of default occurred under Section 7 of the Note because Cook failed to pay Private Bank the principal balance. (Compl. Ex. C (Promissory Note).) On July 11, 2002, Private Bank presented a drawing certificate to JPM (Compl.¶ 19), and JPM honored presentment and caused payment of $7.5 million to Private Bank (Compl. ¶ 20).

Under the terms of the Revolving Credit Facility, Global Crossing is obligated to reimburse JPM as Administrative Agent for the disbursement on the Letter of Credit. (Riley Aff., Ex. A (Credit Agmt.), § 2.05(e).) However, Global Crossing had already entered bankruptcy proceedings by the time Cook defaulted on the Loan, and could not be called upon to fulfill its reimbursement obligation. The Revolving Credit Facility provides that if Global Crossing fails to make the reimbursement payment, then the Administrative Agent is to notify all of the participating Lender Banks of their applicable percentage share, the Lenders are to pay their shares to the Agent, "and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Revolving Credit Lenders." (Riley Aff., Ex. A (Credit Agmt.), § 2.05(e).) The parties appear to agree that the participating Lender Banks paid their applicable credit percentage to JPM as Administrative Agent, with the exception of approximately $300,000 which is not accounted for. (Tr. 5.)[5] Presumably, whatever funds the Lender Banks paid to JPM as Administrative Agent were then transferred to the account of JPM as Issuing Bank, as called for by the Revolving Credit Facility Agreement. At any rate, it is agreed (1) that Cook did not pay Private Bank any money to satisfy the principal of the Promissory Note; (2) that Private Bank received $7.5 million from JPM as a draw on the Letter of Credit; (3) that Global Crossing has not reimbursed anyone, nor can it at present; and (4) that the Revolving Credit Facility has disbursed $7.5 million on the Letter of Credit and has not been reimbursed for it.

## DISCUSSION

### I. *Legal Standard*

#### A. *Standard on a Motion to Dismiss*

Defendant has styled the motion to dismiss the complaint as a motion brought under Rule 12(b)(6), and in the alternative as a motion for summary judgment under Rule 56. On a motion to dismiss pursuant

---

5. *See* Affidavit of Douglas Ogle, sworn to June 19, 2003, at ¶ 5, stating that to date three Lender Banks have failed to fund their shares of the draw on the Letter of Credit, resulting in a deficit of $303,761.25. Cook contends that the identity of the non-paying banks, and the reason for non-payment, are issues requiring discovery. *See* Decl. of Sean Riley in Opp. to Summ. Judgment, executed July 8, 2003.

to Fed.R.Civ.P. 12(b)(6), the ·Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

Defendant relies in part on documents that structured the transactions described in the complaint, which are not attached to the complaint itself, but which defendant attaches to affidavits submitted in support of the motion. While plaintiff argues in its papers that the Court should rely only on those documents upon which plaintiff relied in making the allegations in the complaint (Pl. Opp. at 7), the parties conceded at oral argument that the documents are genuine (Tr. 3), and it appears that plaintiff does not contest that it was indeed aware of the documents upon which defendant relies. Thus, the motion to dismiss will be treated as a motion under Rule 12(b)(6), and all of the documents referred to are available for consideration by the Court in connection with the resolution of the motion.

B. *Standard for Summary Judgment*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and when, viewing the evidence in a light most favorable to the nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. *See Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 45 (2d Cir.2000). While all ambiguities in the evidentiary record must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits … show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the party opposing summary judgment " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114, quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). In this case, the dispute between the parties turns on a question of law; the material facts are all

agreed, or ascertainable or in documents whose contexts are not in dispute.

## II. *Equitable Subrogation*

■ Subrogation "simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant. Factually, the case arises because, for some justifiable reason, the subrogation plaintiff has paid a debt owed by defendant." *Black's Law Dictionary* 1440 (7th ed.1999), quoting Dan B. Dobbs, Law of Remedies § 4.3, at 404 (2d ed.1993). "In short, one party known as the subrogee is substituted for and succeeds to the rights of another party, known as the subrogor. The doctrine of subrogation . . . is based upon principles of equity." *Allstate Insurance Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir.1999), citing *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 105 (2d Cir.1992). The right of subrogation is rooted in the common law, and "does not depend upon contract, but is created simply from the equities of the situation." *Aetna Casualty and Surety Company v. Norwalk Foods, Inc.*, 125 Misc.2d 986, 480 N.Y.S.2d 851, 852–853 (1984); *Chicago Title Insurance Co. v. Eynard*, 81 Misc.2d 931, 367 N.Y.S.2d 399, 401 (1975) ("It is not an absolute right, but one which depends upon the equities and attendant facts and circumstances of each case.").

■ Equitable subrogation essentially provides that the guarantor of another's obligation may seek reimbursement from the obligor. It is relevant in the context of standby letters of credit, such as the Letter of Credit at issue here, because a standby letter of credit resembles, in some ways, a guarantee for another's loan. That is because a beneficiary of a standby letter of credit (here, Private Bank) may normally draw on the letter of credit issued by the issuer (here, JPM) only after a

third party (here, Cook) defaults on a loan. *See Carol Ruth, Inc. v. Provident Life and Accident Ins. Co.*, Dkt. No. 90 Civ. 2400(SWK)(LB), 1995 WL 130530 (S.D.N.Y. March 24, 1995). In such cases, issuers have sought to recover, not from the party that requested the letter of credit, but from the defaulting borrower. Courts grappling with this issue in the absence of a controlling statute have generally found that equitable subrogation does *not* apply to this situation because guarantees and letters of credit remain distinct in that an issuer's obligation under a letter of credit is primary, whereas a guarantor's obligation is secondary. Unlike a guarantor, who becomes subject to liability only if the borrower fails to fulfill its obligation to the borrower's creditor, an issuer of a letter of credit has a primary contractual obligation to the beneficiary, which is independent of the relationship between the beneficiary and its customer. *See generally id.* at *5. Thus, "[h]aving paid its own debt, as it has contractually undertaken to do, the issuer 'cannot then step into the shoes of the creditor to seek subrogation, reimbursement or contribution from the [beneficiary's customer].' " *Tudor Development Group, Inc. v. United States Fidelity & Guaranty Co.*, 968 F.2d 357 (3d Cir.1992), quoting *In re Kaiser Steel*, 89 B.R. 150, 153 (Bankr.D.Colo.B.R. 1988).

In 2000, in response to the widely-accepted conclusion that the common-law remedy of equitable subrogation does not apply to standby letters of credit, the New York Legislature amended the Uniform Commercial Code provision on Letters of Credit to provide for subrogation in certain circumstances. *See* N.Y.S.B.A. Committee Report on N.Y. U.C.C. § 5–117, McKinney's Uniform Commercial Code (2001). Section 5–117 provides that: "(a) An issuer that honors a beneficiary's presentation is subrogated to the rights of the

beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary .... (d) ... [T]he rights of subrogation stated in subsection[ ] (a) ... of this section do not arise until the issuer honors the letter of credit...." N.Y. UCC § 5–117(a), (d).

The question presented on these motions is whether this statutory remedy permits JPM (as Issuing Bank and/or as Administrative Agent of the Facility) to subrogate to the rights of Private Bank (as Beneficiary), to pursue Cook for the defaulted $7.5 million. It is uncontested that the Issuer in this case is JPM and the Beneficiary is Private Bank. It is uncontested that JPM disbursed $7.5 million as a draw on a Letter of Credit which completely satisfied Cook's outstanding obligation to Private Bank. And the structure of the entire deal reveals that the Letter of Credit functioned like a guarantee of Cook's underlying obligation. In other words, the transactions contemplated that if Cook defaulted on the Promissory Note, then Private Bank would present the Letter of Credit and receive $7.5 million from JPM. Therefore, JPM acted like a secondary obligor (or guarantor) of the underlying obligation. The statutory remedy will thus permit JPM to subrogate *if* the other requirements of the subrogation remedy are met.

■ Cook argues that the requirements of subrogation are not met. First, he claims that JPM was made whole for the draw down because the Revolving Credit Facility reimbursed JPM for the disbursement.[6] Thus, any further recovery from Cook would, according to defendant, constitute a double recovery for the Issuer

and thereby violate a well-established principle of equity prohibiting double recovery. (Def.Mem.10.) However, there is no danger that subrogation will unjustly award JPM a *double* recovery, because neither JPM nor anyone else ever received a *primary* recovery from Cook. Cook simply never paid back the loan principal to anyone, ever. If the issuer of a letter of credit has some way of covering its exposure to a draw that does not involve the underlying obligor, that is independent of the underlying obligor's obligation to pay back the loan. For instance, if an issuer borrowed money to cover its losses incurred as a result of a draw on a letter of credit, that would not mean what the issuer could not subrogate to the beneficiary's rights because the issuer had been made whole. Such an issuer would not have been made whole; it would simply owe money to different parties that would need to be repaid, and it would still be entitled to proceed against the obligor. Similarly, to the extent JPM's arrangements with other banks in the consortium required those banks to pay their pro rata shares of the money advanced to cover Cook's default, any money obtained by JPM from Cook in this lawsuit will be held in constructive trust for those banks to prevent unjust enrichment of JPM. But these are matters between JPM and the other banks; they do not affect *Cook's* obligation to repay the $7.5 million he borrowed. Thus, double recovery is not a barrier to JPM subrogating to Private Bank in its capacity as Issuer of the Letter of Credit.

■ In a second and related argument, Cook contends that JPM has no standing

---

6. Whether JPM was fully reimbursed by the other forty-three Lenders, or only partially reimbursed, is irrelevant to this analysis. The point is that under the Credit Agreement the other Lenders are *obliged* to reimburse JPM

as Issuer their pro rata shares of the draw. Thus, discovery concerning who did and who did not reimburse JPM is unnecessary, as those facts are immaterial to the dispute before the Court.

to sue as Administrative Agent of the Facility because the Lenders were not issuers. This argument ignores the economic realities of the transactions. As the documents reveal, JPM issued the Letter of Credit on behalf of all forty-four Lenders in the Facility. The Letter of Credit was supported by a collective line of credit extended to Global Crossing by the consortium of forty-four Lenders, each of whom had a pro rata participation in the Letter of Credit and thus shared in its issuance and the risk of non-reimbursement. While the funds disbursed immediately upon presentment came from JPM, the Letter of Credit, by its very terms, draws upon the Revolving Credit Facility, and *not* upon JPM alone.[7] Thus, Cook's mantra that JPM is the sole issuer repeats a misleading formalism, because in reality JPM is the Issuer on behalf of all forty-four Lenders who each support a specific percentage of the $7.5 million Letter of Credit.[8]

The Lenders who participated in the Facility chose JPM to act on their behalf. However, JPM did not thereby agree to assume the risk for the entire $7.5 million, because the Credit Agreement provides that immediately upon issuance of a letter of credit under the Facility, all Lenders participate in the letter of credit to their percentage share of the Facility. When the Letter of Credit was presented for payment, JPM made the entire $7.5 million disbursement, and then, when no reimbursement was forthcoming from Global

Crossing, JPM called upon the other Lenders to accept their contractual burden to share the loss. In sum, the Letter of Credit was supported by the entire Facility, and the entire Facility is still missing $7.5 million. The allocation of that loss among the different Lenders within the Facility is irrelevant to Cook. That the Facility is still entitled to recover for the draw down regardless of the internal bookkeeping is clear from the language of Credit Agreement § 2.05(e), providing that in the event the Lenders make pro rata reimbursements to the Issuer when Global Crossing fails to reimburse the Facility for the draw down, such payments "shall not relieve [Global Crossing] of their obligation to reimburse such [Letter of Credit] Disbursement." (Riley Aff., Ex. A (Credit Agmt.).) To the extent JPM as Agent recovers funds from Global Crossing, or by extrapolation, from Cook, to cover the draw down, it is obligated to adhere to the Credit Agreement and whatever internal allocation the Lenders in the Facility have agreed to. Therefore, not only does JPM have standing as agent of the Facility to subrogate to Private Bank, but any recovery by JPM would be a primary recovery of the Facility's loss, and not a double recovery.

To find otherwise would penalize the Lenders for participating in a line of credit created by multiple participating banks. For example, had JPM issued a letter of credit drawing, not on a collective line of

---

7. The Letter of Credit incorporates by reference the terms of the Credit Agreement by explicitly stating that the Letter of Credit is "issued pursuant to the Amended and Restated Credit Agreement dated as of August 10, 2000 among [Global Crossing and certain affiliates], certain lenders, certain other parties and the [JPM] as Administrative Agent, and constitutes a Letter of Credit for all purposes of such Credit Agreement." (Compl. Ex. B (Letter of Credit).)

8. Section 2.05(e) of the Credit Agreement provides that "[b]y the issuance of a Letter of Credit ... and without any further action on the part of any Issuing Bank or the Lenders, the applicable Issuing Bank hereby grants to each Revolving Credit Lender ... a participation in such Letter of Credit equal to such Lender's Applicable revolving Credit Percentage of the aggregate amount available to be drawn under such [Letter of Credit]." (Riley Aff., Ex. A (Credit Agmt.).)

credit such as the Revolving Credit Facility, but solely on credit advanced by JPM, it is clear that after JPM honored a draw down on such letter of credit, JPM could be statutorily subrogated to the rights of the beneficiary. There is no reason why the conclusion should be different when the line of credit supporting the Letter of Credit is extended by multiple banks, rather than a single bank.

To disallow statutory subrogation here would take the § 5–117 remedy beyond the reach of collective lines of credit such as this Facility, and would discourage the creation of such loan participation agreements, which are regular features of commercial life. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir.1994) (noting that "loan participations are common."). There is no indication that the New York Legislature intended any such commercially undesirable result. Global Crossing benefited from the multiple lender Facility because it had access to a line of credit far larger than a single lender could provide. The Lenders received the benefit of diversifying the risk for any single draw on the Facility (as here, where all forty-four have shared in the loss of the $7.5 million draw). As a practical matter, in the context of a multiple-lender facility it is more efficient to call upon one bank to issue a letter of credit on behalf of all multiple lenders, rather than have, as would be necessary here if Cook's argument were accepted, forty-four transactions to issue the letter, then forty-four more transactions to present and honor the letter. To avoid such needless complexity, the Lenders in the Facility chose JPM to issue the letter of credit on behalf of all, and agreed to share the risk of non-repayment by covering the draw down once it became clear no reimbursement was forthcoming. The Facility can only act though its contractually-created agents, in contractually-mandated ways. There is no reason why JPM should not be permitted to act as agent for the Lenders in bringing this lawsuit. Accordingly, JPM has standing as Administrative Agent of the Facility to subrogate to Private Bank's right to pursue Cook for breach of the Promissory Note.

■ Cook's final argument against subrogation is that he did not profit from the $7.5 million Loan, and therefore it would not serve equity to subrogate plaintiff to Private Bank's rights of recovery on the Promissory Note. At oral argument, Cook attempted to bolster this contention by describing his participation in the Guaranteed Loan Program as motivated, not by economic self-interest, but rather by a "team player" spirit. (Tr. 11.) Rather than liquidate his GX shares (at the time supposedly worth considerably more than $7.5 million) to the possible detriment of GX, Cook opted to weather the storm of share price decline by borrowing $7.5 million to offset the losses caused by the stock depreciation, in the hope that the share price would eventually recover and he could pay back the Loan from gains on the recovered stock price. Moreover, under the terms of the Collateral Agreement, Cook was unable to liquidate his GX stock as long as the Promissory Note was outstanding. Cook argues that he did all of this to benefit Global Crossing, and not for himself. As events transpired, this turned out to be an unprofitable gamble for Cook. The GX stock price never recovered, and he was left with GX stock worth considerably less than $7.5 million, and a debt to Private Bank in that amount.

However, this argument amounts to nothing more than that Cook assumed a risk, and made what turned out to be a series of ill-advised business decisions. Cook, a principal executive of Global Crossing, took actions he hoped would better the price of its stock, in which he held a major position, rather than to liquidate

that stock to cover a margin call. Had GX stock increased in value, he would have profited by being able to repay the Loan, and preserve his investment. As it happened, the strategy failed. But, the Facility did not underwrite the risk of Cook's financial strategy, it merely guaranteed Private Bank that it would recover whatever portion of the $7.5 million Loan Cook might fail to repay on the maturity date. Cook does not claim that he did not knowingly assume the debt and undertake the obligations connected to it. Cook cannot reasonably have expected that the Guaranteed Loan Program amounted to a gift of $7.5 million, because the circularity of the deal structure provided that at the end of the day, Cook would have a legal obligation to reimburse Global Crossing for any draw down on the Letter of Credit. Thus, from the inception of the loan, Cook knew that he was ultimately accountable for any amount he borrowed under the Guaranteed Loan Program. The unforeseen bankruptcy of Global Crossing, the underlying guarantor of Cook's loan, does not change Cook's obligation to repay what he borrowed.

Cook contends that contested issues of fact concerning (1) the purpose of the Loan Guarantee Plan, (2) GX executives' understanding of that Plan, and (3) whether all the Lenders reimbursed JPM their pro rata participations in the Letter of Credit, require discovery and preclude summary judgment for plaintiff. However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. As the foregoing analysis demonstrates, none of these alleged factual issues have any bearing on the purely legal question of whether JPM may subrogate to the rights of Private Bank, which requires interpretation of the relevant transactional documents and the law. The above analysis assumes that the Loan Guarantee Plan was concocted by Global Crossing to induce executives not to liquidate their stock; since the Court accepts Cook's characterization of the purpose of the GX plan, there is no need for discovery. Whether Cook or other executives believed that Global Crossing eventually would make them whole for any losses by forgiving their debts to it, is a matter between them and the company, and the eventual unwillingness or inability of Global Crossing to meet those expectations does not affect the obligation of Cook to repay the money he borrowed. And as already noted,[9] Cook's obligation and JPM's right to subrogation are not affected by which of the Lender Banks are and which are not entitled to share in funds recovered by JPM. Therefore, the allegedly contested facts raised by defendant do not preclude summary judgment for plaintiff in this case.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is denied, and plaintiff's motion for summary judgment is granted. Plaintiff is directed to submit a proposed Order of Judgment to the Court within ten days of the issuance of this Opinion.

---

9. See note 6, *supra*.